RHODE ISLAND HANDICAPPED ACTION COMMITTEE; Paraplegia Association of Rhode Island; Esther Littell; Kathleen J. Podgurski; Angelina De Bartolo

v.

RHODE ISLAND PUBLIC TRANSIT AUTHORITY, et als.

Civ. A. No. 80–0631.

United States District Court,
D. Rhode Island.

Sept. 20, 1982.

Robert Mann, Carolyn Roundy, Jean Mu-
siker, Providence, R.I., for plaintiffs.

Anthony Muri, Susan M. Huntley, Levy,
Goodman, Semonoff & Gorin, Providence,
R.I., Michael L. Martinez, U.S. Dept. of
Transp., Washington, D.C., Stephen Mullen,
R.I. Dept. of the Atty. Gen., Providence,
R.I., Patrick J. Quinlan, R.I. Dept. of
Transp., Providence, R.I., for defendants.

## OPINION

PETTINE, Senior District Judge.

This is a case of major public importance
concerning the appropriate balance between
the right of handicapped persons to use
public transportation services and the limit-

ed resources of the transportation authorities. Plaintiffs are three mobility handicapped individuals, the Rhode Island Handicapped Action Committee, and the Paraplegic Association of Rhode Island. They represent a class of mobility handicapped persons who have been denied access to the publicly operated buses in Rhode Island. This class, certified on April 8, 1981, has been broken down into two subclasses: mobility handicapped persons confined to wheelchairs and mobility handicapped persons not confined to wheelchairs. This latter group is often described as semi-ambulatory.

The principal defendant in this action is the Rhode Island Public Transit Authority (RIPTA), which runs all publicly operated fixed route transportation in Rhode Island. Other defendants are the Rhode Island Department of Transportation (RIDOT), the directors and manager of RIPTA, the Secretary of the United States Department of Transportation (DOT), the Administrator of the Urban Mass Transportation Administration (UMTA), the Rhode Island Statewide Planning Program, and the Statewide Planning Council.

Plaintiffs' primary challenge is to the proposed purchase by RIDOT and RIPTA of 42 buses not equipped with wheelchair lifts. Plaintiffs also challenge a variety of other practices which they claim discriminate against the mobility handicapped. Some of those policies are: the scheduling of routes accessible to the handicapped; the nonutilization of lift-equipped buses already owned by RIPTA; the inadequacy of the locking mechanism in lift-equipped buses for the purpose of securing electric wheelchair users; the refusal to allow semi-ambulatory persons to use the wheelchair lifts; and the failure to plan for the transportation needs of the handicapped.

Plaintiffs challenge these practices under § 504 of the Rehabilitation Act of 1973, 49 U.S.C. § 794; § 16(a) of the Urban Mass Transit Act, 49 U.S.C. § 1612(a) (the UMT Act); the equal protection clause of the Fourteenth Amendment; and Rhode Island General Laws § 40–9.1–1. Plaintiffs request injunctive and declaratory relief, as well as an award of attorneys' fees. Jurisdiction is premised on 28 U.S.C. §§ 1331, 1343, 2201 and 2202.

I. *Facts*

The findings of fact that follow are indeed detailed and lengthy; however, this acknowledgement is not a confession of prolixity. Rather, said recitation of facts is a very necessary preface to this Court's conclusions of law and ultimate decision.

A. *Need for Transportation for the Handicapped*

The need to improve the accessibility of mass transportation to handicapped persons must be assessed in light of the characteristics of the handicapped population of Rhode Island. Plaintiffs were able to supply some statistical evidence in this regard by introducing the results of a 1980 census which was conducted by the Governor's Committee on Employment of the Handicapped. Plaintiffs' Exhibit 26. The census indicates that there are approximately 166,200 disabled persons in Rhode Island, which is roughly 17.6% of the state's population. Only 20.8 percent of the 76,000 disabled persons who are considered part of the labor force are employed. Those who are employed are more likely to be in low-wage, low-level jobs. Almost three-quarters of the disabled population receive subsidies from social security, public assistance, or pensions. Fifty-three percent of them use aid equipment such as canes, walkers or wheelchairs. Sixty-seven percent reported that they tend to remain at home most of the time because of their disability, while a substantial number of respondents indicated that transportation was a major area of need.

The defendants for their part contend that the results of the census presented by the plaintiffs are unreliable. They point out that the survey relied exclusively on respondents to classify themselves as disabled or nondisabled. They question the validity of such vague and subjective judgments. RIPTA also presented evidence

that the 1970 census found that there were only 50,272 disabled persons in Rhode Island. Defendants' Exhibit P. This means that if the 1980 census is accurate, the number of disabled in Rhode Island would have tripled in just ten years. Defendants maintain that this is implausible.

RIPTA also points out that it is impossible to determine from the census data how many of the disabled are confined to wheelchairs or are only semi-ambulatory (i.e. able to walk, but unable to climb steps). And while the survey indicates that a substantial number of the disabled expressed a need for transportation, it is unclear how many of these persons could effectively use fixed route mass transportation. In short, the statistics suggest that there is a need on the part of the handicapped for greater transportation services. The nature and extent of that need, however, is not completely revealed by the available statistical evidence.

Plaintiffs did introduce some testimony concerning the number of wheelchair users in the state. According to Edward J. Schroeder, Chairman of the Governor's Committee on the Handicapped, there are approximately 4,300 wheelchair users in the state. 15 Tr. 97.[1] Considering Rhode Island's population in relation to that of the nation, this figure is consistent with nationwide statistics compiled by the National Center for Health Statistics. Those statistics show that there are about 800,000 non-institutionalized wheelchair users in the United States. 10 Tr. 16.

The plaintiffs also introduced substantial expert testimony that transportation is of critical importance to the quality of life experienced by handicapped persons. *E.g.,* 10 Tr. 29–30, 75; 15 Tr. 94, 97. Transportation furnishes the vital link which enables the handicapped to obtain access to jobs, education, medical care, recreation and the other activities of modern living. Testimony received by the Court indicates that a lack of transportation usually leads to inac-

tivity, which may be responsible for a variety of medical problems ranging from bed sores to depression. Dr. Gerben DeJong, who has conducted a substantial amount of research in this area, also testified that the absence of available transportation seems to correlate with an increased frequency of hospitalization. 10 Tr. 83. Finally, plaintiffs' experts testified that transportation is considered a key environmental variable in the treatment of the disabled by medical doctors who specialize in such treatment. 10 Tr. 12, 52, 67.

The plaintiffs' evidence also indicates that the demand for transportation services by the handicapped is likely to increase in the future. Several factors explain this trend. Among the most important of these are the increased mainstreaming of disabled persons, the increase in the use of electric wheelchairs, and the increased accessibility of buildings and public facilities. Pl. Exhibit 7; 10 Tr. 23–25; 14 Tr. 5; 15 Tr. 103; 21 Tr. 59.

Defendants for the most part did not take issue with the testimony concerning the importance of and need for transportation of the handicapped. The important question they raise is whether RIPTA's current efforts constitute an adequate attempt to meet this need, and whether further modifications of the mass transportation system are required.

### B. Current Efforts to Provide Transportation for the Handicapped

Two types of transportation service are provided to the handicapped in Rhode Island. The first type, fixed route transportation, provides service along an established route according to a set timetable. The second type, paratransit, provides door-to-door transportation in response to a specific request by a handicapped person. The current amount of service being offered by each system will be considered separately.

---

1. This case was heard between June 9, 1982 and June 21, 1982. Citations to the record will be in this form: day of month/transcript/page.

### 1. *Fixed Route Transportation*

RIPTA operates a fleet of 267 buses on its fixed route system. 9 Tr. 36. At present, 53 of these buses are equipped with lifts which make them accessible to wheelchair users.

The operation of the lift was described by Patrick Joyce, RIPTA's Director of Maintenance. 14 Tr. 29–31. The lift is located at the rear door of the bus. The driver puts the bus in park, goes to the rear door, and operates a switch. The steps leading to the door collapse into a platform, which lowers to the ground. The wheelchair user wheels onto the platform and is then lifted up to the interior of the bus. After the passenger wheels off the platform, the driver finishes the cycle by returning the platform to its original form. This cycle takes about 23 seconds. The driver then spends about 30 seconds assisting the passenger in securing himself within the wheelchair bay, a space specially set aside for wheelchair users.

Nineteen of these buses were purchased in September 1978 and are equipped with two wheelchair bays. 9 Tr. 36. Thirty-four additional lift-equipped buses were acquired in July and August 1981, but these buses have only one wheelchair bay. 9 Tr. 37; 17 Tr. 3–17. The buses presently service 30 fixed routes.

Plaintiffs point out that the handicapped accessibility of the fixed route system cannot be described as extensive. *See* Def. Ex. N. In particular, there is very little service available on weekends, and virtually no service in the evening. RIPTA's schedules indicate that most wheelchair accessible service ends between the hours of 5:00 p.m. and 7:00 p.m., and the last wheelchair accessible bus starts its final run at 7:38 p.m. Important routes remain completely inaccessible. Among these are the routes which service the Amtrak station in Kingston, Rhode Island, the University of Rhode Island, and Rhode Island College. There is also no wheelchair service on any of RIPTA's park-n-ride routes or routes which serve a specific major employer, such as Electric Boat. Finally, while the Providence to Newport run is wheelchair accessible, there is no accessible service within the City of Newport.

The difficulty some wheelchair users have with the current system is illustrated by the experience of Joseph Tremmel. *See* 15 Tr. 14–34. Mr. Tremmel was born with cerebral palsy and is confined to a wheelchair. He uses the bus four or five times a week. He frequently travels to downtown Providence on a bus which passes near his home. Returning home is a more difficult matter. The last lift-equipped bus leaves Providence at 5:15 p.m. and does not travel all the way to his home, making it necessary for him to push himself a mile and a half to his home. A later bus without a lift does travel all the way to his home. During the course of the trial, RIPTA issued a new schedule. Now the last bus Mr. Tremmel can take leaves Providence at 2:40 p.m.. This bus's route also terminates a mile and a half from Mr. Tremmel's home. 21 Tr. 63–64.

Ridership by wheelchair passengers for 1980 and 1981 was light. *See* Pl. Ex. 11; 10 Tr. 148. In 1980, the system provided 488 one-way trips to wheelchair users, and 605 one-way trips in 1981. The figures for the first five months of 1982, however, indicate a 37% increase in ridership over the same period in 1981. Plaintiffs acknowledge that this does not constitute a high level of utilization. They contend, however, that this can be explained by the rather limited service which is available, and by the problems with outreach, marketing, and planning which will be discussed below.

### 2. *Paratransit Service*

RIPTA introduced evidence that a great deal of paratransit service is provided to the handicapped in Rhode Island. The authority contends that paratransit is a more effective means of providing transportation to the handicapped than the fixed route system, and that available funding should be spent on improving this alternative instead of using the funds to increase the number of wheelchair accessible buses. The evidence indicated that Rhode Island began its involvement in paratransit opera-

tions as early as 1972. *See* Def. Ex. P. By 1975 there were more than 16 providers of paratransit services who supplied more than 623,565 one-way trips. *Id.* In 1979 the 12 largest paratransit services provided 684,020 trips, a figure which jumped to 78,653 trips *per month* in 1981. *Id.* All of this was accomplished with the help of substantial funding by the state. In fiscal year 1981, for example, Rhode Island provided $1,415,827 in assistance to paratransit agencies which serve the elderly and the handicapped. *See* Def. Ex. C and R.

RIPTA claims that the principal advantage of paratransit is that it can serve persons with a broader variety of handicaps, many of whom cannot use fixed route transportation because mental or physical problems or other difficulties make it impossible for them to get to and from the bus stop. *E.g.* 15 Tr. 37. For this reason, a number of mobility handicapped persons, as well as persons who provide services to the handicapped, testified that an expansion of the paratransit system, rather than the fixed route system, would best serve the transportation needs of the handicapped. *E.g.,* 17 Tr. 55, 2–22; 18 Tr. 5, 80; 21 Tr. 17. RIPTA also pointed to the much larger number of rides provided by paratransit as evidence that this system is more cost effective than fixed route transportation. *See* Def. Ex. P.

Plaintiffs do not dispute the advantages of paratransit. Nor do they contest the fact that paratransit is essential for some handicapped persons who are unable to use a fixed route system. Plaintiffs point out, however, that the current paratransit system does not meet more than a fraction of the transportation needs of the mobility handicapped. Evidence at trial indicated that lack of available funding requires paratransit agencies to provide only certain types of priority service. For example, Senior Citizens Transportation, Inc., the only statewide paratransit service, provides service to the handicapped primarily for medical purposes or for transportation to special activities for the handicapped. 17 Tr. 34. Much of the paratransit service supplied by agencies is also limited to

clients of the agencies or transportation to agency functions. 17 Tr. 75. The evidence reveals that this is largely true of paratransit service provided by the Paraplegia Association of Rhode Island and the United Cerebral Palsy. *See* 15 Tr. 3; 17 Tr. 4–6.

Because of the need to arrange trips on a priority basis, a substantial wait is frequently required to obtain transportation from paratransit services. This wait can range anywhere from one day to one week if transportation is sought by a client of the agency involved. For others the wait may be even longer. Steven Polideros of Senior Citizens Transport, Inc. testified that a three week notice was required for doctor's appointments. 17 Tr. 48. Certain paratransit services also limit their service to persons who are not affiliated with an agency or those who earn less than a stated annual income. For Senior Citizens Transportation, a paratransit user's income must be under $4,000 per year. 17 Tr. 76.

Plaintiffs also introduced considerable evidence on the necessity of developing a transportation system that integrates both paratransit and fixed route elements. Two directors of paratransit organizations, Loretta Santagata and Susan Pelkey, testified that their systems' effectiveness could be enhanced if they were used as feeders for RIPTA's fixed route system. 17 Tr. 39; 17 Tr. 2–24, 2–25. Wendell Flanders, then director of RIDOT, expressed a similar view at RIPTA's June 9, 1980 meeting. Pl. Ex. 17. And a memorandum prepared by the staff of the State Planning Council suggests that providing economical service to the handicapped can be significantly facilitated by diverting as many trips as possible to the fixed route system. Pl. Ex. 6.

The parties' competing visions of the appropriate transportation system for mobility impaired persons is illustrated by the divergent models of Seattle and Houston. B.J. Carol, Project Manager for Accessible Implementation for the Municipality of Metropolitan Seattle's (Metro) transportation system, testified for plaintiffs. Efforts to provide handicapped access in Seattle

began in 1976, when Metro commissioned an independent study to determine what steps were necessary to provide public transportation for the mobility impaired. According to Miss Carol, "[t]he general conclusion from that survey was not that a new transportation system was needed, but that the barriers to the existing transportation system needed to be removed." 11 Tr. 19. Metro acted on this information in 1978 by deciding to purchase only lift-equipped buses. Metro now has lifts on 358 of its 1,100 buses, and is awaiting delivery of 186 more lift-equipped buses. 11 Tr. 122–124.

In addition, Metro took many steps to insure that mobility impaired persons utilized the fixed route system. An elderly and handicapped committee was established to advise the transportation authorities on the transportation needs of these groups; this committee has been quite active. 11 Tr. 21–23. Metro advertised and marketed its accessible fixed route system. 11 Tr. 23, 31. It established an outreach program to demonstrate the use of the lift-equipped buses. 11 Tr. 31.32. In order to remedy a problem with the tie-down device for securing a wheelchair—the device was not made for the thicker wheels on electric wheelchairs—Metro devised an inexpensive method of using cargo straps. 11 Tr. 37–39. This effort has been strikingly successful. During the course of the program, usage of fixed route buses by persons in wheelchairs has increased from 20 to 133 rides per day. 11 Tr. 48. This increase in ridership is directly related to the increase in accessible service. *Id.* Not only does the addition of a new route permit a wheelchair user residing along that route access to the system, but, as Miss Carol explained, it also permits wheelchair users residing elsewhere to transfer onto the route. "So," Miss Carol stated, "the system kind of builds and increases. The more routes you get, you can get more than just a direct proportion of riders...." *Id.* Metro also provides paratransit service in the form of vans and a taxi subsidy program. 11 Tr. 20.

Frank Sheehan, an employee of the Metropolitan Transit Authority of Harris County Texas, testified for defendants. Mr. Sheehan is program manager of the Metro Lift Elderly and Handicapped ParaTransit Service for the Authority, which primarily services the City of Houston. The Authority has no wheelchair accessible buses. 18 Tr. 51. Rather, it provides between 33,000–36,000 monthly trips to elderly and disabled persons in vans and sedans. 18 Tr. 47. The system provides "curb-to-curb" service, picking up passengers at their home and delivering them to their destination. 18 Tr. 43. Any handicapped person may register to use the service. 18 Tr. 48.

Two forms of service are available: subscription trips and reservation trips. 18 Tr. 69–71. A person requiring paratransit on a regular basis—for example, for work or dialysis—may arrange to have a regular schedule of service. Otherwise, reservations must be made 48 hours in advance. On an average day, the Authority receives about 1,000 requests for reservations. 18 Tr. 60. Ordinarily, about 20–25 of these requests must be denied due to an inability to arrange a trip on the requested day. In case of a breakdown in the Authority's vehicles, taxi operators under contract to the Authority provide backup service. 18 Tr. 64–65.

### C. *Principal Areas of Controversy*

Turning to plaintiffs' allegations that the defendants' efforts to provide transportation to the handicapped are not in compliance with federal and state law, I find that there are four principal areas of controversy. These concern RIPTA's proposal to acquire 42 new buses without wheelchair lifts, RIPTA's current use of its wheelchair accessible buses, RIPTA's efforts to aid the semi-ambulatory, and the participation of the handicapped in the transportation planning process. Each of these areas will be considered in turn.

### 1. *Wheelchair Lifts and Bays on Buses to be Acquired by RIPTA*

RIPTA currently is in the process of acquiring 47 additional buses for its fleet. Five of these buses will be articulated buses

which are being purchased as part of an experimental program funded by UMTA. These buses will be accessible to wheelchairs. 10 Tr. 158–60. RIPTA has also proposed to acquire 42 Advanced Design buses without wheelchair lifts. 9 Tr. 73; 10 Tr. 115–16. It is this decision that is probably the most important bone of contention between the parties.

The events leading up to this decision began on August 13, 1981 when UMTA granted RIDOT $5.7 million under sections three and five of the Urban Mass Transportation Act. 49 U.S.C. §§ 1602 and 1604. On November 11, 1981 an additional grant of $780,000 was made under section three. The purpose of these grants was to provide 80% of the funds needed by RIPTA to purchase 42 wheelchair lift-equipped buses. 10 Tr. 109–111. When RIDOT had first applied for these grants, federal regulations required that all new buses purchased with federal funds be wheelchair lift equipped. 49 C.F.R. Part 27 (1979). These regulations, however, were found to exceed the scope of the requirements of the Rehabilitation Act in *American Public Transit Ass'n v. Lewis,* 655 F.2d 1272 (D.C.Cir. 1981).

In response to this ruling, the United States Department of Transportation adopted a new interim final regulation which merely requires that recipients of federal funds certify to UMTA that they are making "special efforts" to accommodate the transportation needs of the handicapped. 49 C.F.R. § 27.77 (1981). The determination of what special efforts are sufficient to satisfy the requirements of the regulation is left to the local recipients, although an Appendix to the regulations gives three illustrative examples of what efforts will be considered sufficient. 49 C.F.R. § 27.77, Appendix A (1981). One of these examples states that the special efforts requirement may be satisfied if a grant recipient spends an annual average of 3.5% of the funds it has received from UMTA under section five of the Urban Mass Transportation Act on programs for the handicapped. On September 18, 1981, RIDOT certified to UMTA that it was meeting the special efforts requirement.

All parties in this action have stipulated that this certification was accurate inasmuch as both RIDOT and RIPTA have expended more than 3.5% of their section five funds on programs for the transportation of handicapped persons. *See* 16 Tr. 31. Notably, however, UMTA did not express any disapproval of the forthcoming purchase by RIPTA of lift-equipped buses. UMTA's grant may still be used to purchase lift-equipped buses. 14 Tr. 21–22.

In light of these regulatory changes, on February 8, 1982 the RIPTA Board of Directors voted to authorize the purchase of the 42 buses without wheelchair lifts. 10 Tr. 115–16. In reaching this decision, the Board observed that RIPTA carried only 22 one-way wheelchair patrons per month, and that this figure had not increased despite the acquisition of 34 new lift-equipped buses. Pl. Ex. 17. Plaintiffs point out this last observation was based in part on a misperception. The evidence introduced by defendants indicates that despite the acquisition of the 34 new lift-equipped buses in June and July 1981, the number of such buses in use on wheelchair routes had actually declined from 12 from January to April 1981 to 11 from April 1981 to January 2, 1982. Def. Ex. H.

It is worth noting that on December 28, 1981, RIPTA's management advised that RIPTA use its UMTA grant to purchase New Look rather than Advanced Design buses. 9 Tr. 71. The RIPTA board rejected this recommendation and ordered the purchase of Advanced Design buses. 9 Tr. 73. Plaintiffs introduced evidence that the New Look buses have a larger seating capacity and cost less than the type of bus which RIPTA decided to purchase. 9 Tr. 59–60, 75–76. Plaintiffs claim that this information is relevant in determining the actual importance that RIPTA attaches to providing service with adequate seating which is cost effective. RIPTA, however, contends that the Advanced Design buses are more aesthetically pleasing, are safer, and have various other amenities not found on New Look buses. 9 Tr. 60.

Following these decisions, plaintiffs sought preliminary injunctive relief to prevent RIPTA from taking any steps toward acquiring new buses without wheelchair lifts. Pursuant to an agreement of the parties on March 5, 1982, it was decided that RIPTA would be permitted to initiate the bidding process. In order to allow for all contingencies, it was provided that RIPTA would solicit bids for: 1) buses without lifts; 2) buses with lifts and one wheelchair bay; and 3) buses with lifts and two wheelchair bays. These bids were received and opened on July 12, 1982. Stipulation of plaintiffs and defendant RIPTA, July 30, 1982. Two manufacturers, General Motors and Grummen Flxible, submitted bids in three forms: buses without lifts; buses with a lift and one wheelchair bay; and buses with a lift and two bays. The bids were as follows:

|  | No Lift | Lift & One Bay | Lift & Two Bays |
|---|---|---|---|
| General Motors | 143,777 | 151,991 | 152,130 |
| Grummen Flxible | 148,500 | 159,468 | 159,963 |

RIPTA has not yet decided which bid to accept.

Much of the controversy at trial centered on whether the handicapped would actually benefit from an increase in the number of lift-equipped buses. RIPTA contends that plaintiffs have failed to show how expansion of the fixed route system will confer any substantial benefit on handicapped persons. It points out that the plaintiffs introduced no reliable statistical evidence as to the number of wheelchair users in Rhode Island. Nor could plaintiffs document the number of such users who would take advantage of a fully accessible bus system or the increase in ridership which the purchase of 42 additional lift-equipped buses could be expected to generate. The defendants also introduced evidence that barriers other than the accessibility of buses may make it impossible for wheelchair users to utilize fixed route transportation. These barriers include adverse terrain or weather, insufficient physical strength, problems with the location of the wheelchair user's home or destination, and physical or mental conditions that require certain handicapped persons to remain at home. *See, e.g.,* Testimony of Donna M. Cone, 16 Tr. 2–18, 2–19; Testimony of Dr. Conklin, 18 Tr. 80.

This observation was supported by the testimony of some of the mobility handicapped people who testified at trial. Kathleen Podgurski testified that she is unable to use her wheelchair to reach a bus stop near her home because she lacks the physical strength necessary to negotiate a hill along the way. 15 Tr. 40. Elaine Trott stated that she does not live on a bus line and prefers to travel by car. 21 Tr. 8. Doreen Bethea testified that she would rather not deal with the public. 18 Tr. 5. John Gaffney testified that he could not get up the hill to the bus stop near his home. 16 Tr. 54.

RIPTA's final point is that the current low level of ridership by wheelchair users is compelling evidence that expansion of the fixed route system is unwarranted and will not benefit the handicapped.

Plaintiffs respond that the current low ridership level is not inherent in the nature of the fixed route system, but rather is the result of the inadequacy of RIPTA's current policies. Plaintiffs stress in particular the limited level of service that is available, both in terms of the few routes which are accessible at all, and the even fewer routes which provide service on weekends or in the evening. Plaintiffs also contend there has been a lack of marketing by RIPTA which is aimed at encouraging the handicapped to use the bus system, and that RIPTA has failed to involve the handicapped in the planning and implementation process in a significant way.

The plaintiffs introduced evidence that the Seattle mass transit system has benefitted from relatively high handicapped ridership. Miss Carol, Director of Seattle's accessibility program, attributes this to the fact that Seattle has reliable accessible service which is extensive in its coverage and which is the result of close cooperation and planning with organizations for the handicapped. 11 Tr. 51–52, 59–60. Plaintiffs' witnesses suggested that the purchase of 42

additional buses would allow RIPTA to provide much more extensive accessible service which, if combined with careful planning, marketing, and outreach strategies, would significantly increase the ridership levels of the handicapped population. This point of view was best expressed by Edward Schroeder, Chairman of the Governor's Committee on the Employment of the Handicapped. He stated that the "token effort by RIPTA is creating a kind of token response by the disabled." 15 Tr. 100. He testified that handicapped ridership will increase as the system becomes more credible. 15 Tr. 103; 16 Tr. 9. Several disabled witnesses testified that they will utilize RIPTA's system if that system becomes more accessible. *E.g.* 14 Tr. 65, 74; 15 Tr. 39, 49.

An additional indication of the potential ridership by wheelchair users is provided by the Rhode Island House of Representatives, which has noted that there are 3,000 Rhode Island wheelchair users who have expressed the need for an accessible transportation system. Pl. Ex. 34. (House Resolution, H 7837, March 11, 1982). Stephen Kapalka, program coordinator for the Independent Living Project, testified that most of the 20 wheelchair users in the project could use lift-equipped buses. 21 Tr. 38. Dr. Findlay testified that about 150–200 wheelchair-bound children at Meeting Street School could use a fixed route bus system. 21 Tr. 57–58. But Alice Cassidy, a social worker at the school, disagreed with this assessment, saying that virtually none of the children could use the fixed route system. 17 Tr. 2–5.

The plaintiffs concede that environmental barriers can be a problem for wheelchair users who utilize fixed route transportation. They contend, nevertheless, that many of these barriers can be overcome. They point out that electric wheelchairs can assist many handicapped persons to overcome barriers such as hills. 10 Tr. 25; 21 Tr. 46–47. As further evidence in this regard, plaintiffs introduced testimony that Seattle is a very hilly city, 11 Tr. 15–16, in which 80% of the handicapped bus riders travel two or more blocks to a bus stop. Pl. Ex. 21. Nevertheless, the Seattle system enjoys a relatively high level of ridership by handicapped persons. 11 Tr. 50, 75.

The plaintiffs did not try to dispute defendants' evidence showing that persons who are mentally as well as physically disabled, *see* 16 Tr. 2–18, or who are severely impaired by cancer, *see* 18 Tr. 80, or kidney diseases, *see* 17 Tr. 2–48, among others, are unable to use fixed route transportation. For these people, paratransit is a must. Several experts testified, however, that most wheelchair users could use fixed route transportation if the buses were lift-equipped. Testimony of Dr. Corcoran, 10 Tr. 25–27; testimony of Stephen Kapalka, 21 Tr. 38; testimony of Dr. Findley, 21 Tr. 46. Even those witnesses for the defendants who testified that the need for paratransit is greater than the need for lift-equipped buses admitted that the best solution was a fully integrated system with both paratransit and accessible fixed route transportation. Testimony of John Gaffney, 16 Tr. 55; testimony of Donna Cone, 16 Tr. 2–30; testimony of Faith Davis, 18 Tr. 24; testimony of Loretta Santagata, 18 Tr. 41; testimony of Hugh Gallagher, 21 Tr. 19.

Further testimony was received that suggests that increased use of the bus system by handicapped persons is likely to be gradual. Plaintiffs' experts testified that the handicapped may frequently use the bus initially on weekends and in other situations in which reliance on transportation is not critical. 11 Tr. 36. After gaining familiarity with the system and trust in its reliability, the mobility impaired will then use the bus more frequently for regular travel such as to and from work. 11 Tr. 47. Plaintiffs contend, however, that because of RIPTA's limited service many handicapped persons do not get an opportunity to develop the necessary familiarity with and trust in the system, which are prerequisites to regular use.

Finally, the plaintiffs concede that it is impossible to demonstrate statistically the amount of benefit or the increase in ridership that will result from an increase in the accessibility of RIPTA's fixed route system.

On balance, however, the plaintiffs contend that the evidence shows that a substantial benefit in terms of increased access to and use of the fixed route system by the handicapped will result from an increase in the number of lift-equipped buses. *See* testimony of Dr. Corcoran, 10 Tr. 12, 27–28, 52; testimony of Dr. DeJong, 10 Tr. 83, 96–99.

Of course any such benefit must be viewed in light of the costs of purchasing wheelchair lifts on the buses in question. Equipping the new buses with wheelchair lifts and bays will cost over $8,000 per bus, or more than $320,000 to equip the 42 buses which are to be purchased. Eighty percent of this cost would be paid for out of federal funds made available by UMTA, and the remaining 20% will be supplied by the state from bond issues. After the purchase of the lifts, certain costs would also be incurred in maintaining them. The evidence indicates that RIPTA has incurred the following costs since 1978 with respect to its 53 lift-equipped buses: $3,323.00 for preventive maintenance, *see* Def. Ex. J; $12,919.33 for repair parts, *see* Def. Ex. D; $27,222.18 for standby mechanics and drivers who perform daily inspection and testing of the lifts. *See* Def. Ex. E and H.

### 2. *RIPTA's Use of Equipment That Is Presently Available*

Plaintiffs also argued that several of RIPTA's current policies discriminate against the handicapped in violation of federal and state law. One of plaintiffs' principal concerns is with the reserve ratio of lift-equipped buses maintained by RIPTA. The reserve ratio refers to the percentage of buses held in reserve for the purpose of replacing buses in service which experience mechanical difficulties. The plaintiffs claim that the reserve ratio for wheelchair equipped buses is inordinately high, and that this prevents effective use of the buses for transportation of the handicapped.

Patrick Joyce, RIPTA's director of maintenance, testified that RIPTA generally maintained a reserve ratio of 15% of its

fleet. 10 Tr. 51. He conceded, however, that a newer fleet can be operated with a lower reserve ratio. *Id.* This accords with a 1980 RIPTA study on accessibility which assumed a general 18% reserve ratio, but allowed a 10% ratio for the newer accessible buses. Pl. Ex. 2 at 14. Mr. Joyce and Miss Carol both asserted that a fleet of lift-equipped buses does not require a larger reserve ratio than a fleet of non-accessible buses. 10 Tr. 52, 11 Tr. 44. However, Mr. Joyce later stated that a more complex bus is more likely to break down, and that a lift is a complex device. 14 Tr. 55.

RIPTA's historical usage of its lift-equipped buses deviates quite markedly from the reserve ratios of 10–15% discussed above. RIPTA received its first 19 lift-equipped buses in 1979. 9 Tr. 93. Until January of 1982, RIPTA only used 11 or 12 of these buses on accessible routes. 9 Tr. 89. The remainder were not stored in the garage; rather, they were used on non-accessible routes. 9 Tr. 91. In July and August of 1981, RIPTA received 34 additional lift-equipped buses, 17 Tr. 3–17, for a total of 53 accessible buses. Nevertheless, it was not until January 1982 that RIPTA increased its number of accessible runs, and then it only used 20 of its 53 buses on accessible routes. 9 Tr. 94–95. The remainder of the new buses were not garaged; rather, they were used on non-accessible lines. 9 Tr. 95. On April 23, 1982, three additional buses were put into service on accessible routes, 10 Tr. 161, and two more were added on June 25, giving a total of 25 accessible buses. 10 Tr. 166. RIPTA's manager, Mr. Trevitt, testified that he believed RIPTA had the capability of using 35 or 36 buses on accessible routes. 10 Tr. 166. Thus, prior to the summer of 1981, for its accessible buses, RIPTA maintained a reserve ratio of approximately 37–42%, which rose to approximately 80% for the period before January 1982, and currently is approximately 53%.[2]

---

**2.** The record does not reveal the precise manner in which the reserve ratio is calculated. The Court has determined that the following formula is appropriate:

$$\text{Reserve ratio} = \frac{\text{buses held in reserve}}{\text{buses in use} + \text{buses in reserve}}$$

RIPTA presented testimony that a larger reserve ratio is necessary for lift-equipped buses than is normally required. 9 Tr. 90–92. This is because RIPTA seeks to guarantee reliable service by only replacing an inoperable lift-operated bus with another lift-equipped bus. This in turn means that RIPTA cannot draw on the larger pool of non-lift-equipped buses should an unusual number of breakdowns occur on lift-equipped buses. Instead, RIPTA must maintain a larger than normal reserve ratio to guard against this possibility.

A second problem noted by the plaintiffs is that the clamps on RIPTA's lift-equipped buses do not function properly when used to secure an electric wheelchair. Apparently, the wheel on an electric wheelchair is too large to fit in the clamp. Timothy Marland, an electric wheelchair user, testified that he requires a companion when he uses the bus. 14 Tr. 72–73.

When the Seattle bus system first received delivery of its accessible buses, it discovered that the clamp "would not accommodate the motorized chairs that we have. Kind of embarrassing." Testimony of B.J. Carol, 11 Tr. 37. To remedy this situation, the Seattle bus authority devised and installed cargo straps costing less than $100 a pair. 11 Tr. 39. It was not necessary to send the buses back to the factory. RIPTA introduced no testimony on this issue; evidently it has taken no steps to make its buses accessible to electric wheelchair users.

Plaintiffs' third objection concerns the 34 lift-equipped buses purchased in 1981. Each of these buses has only one wheelchair bay. 9 Tr. 53. They therefore differ from the first 19 buses purchased by RIPTA, which have two bays. 9 Tr. 38. The plaintiffs contend that the absence of a second bay may significantly deter handicapped persons from using the bus system by increasing the risk that a wheelchair user will not be able to find an unoccupied bay. Retrofitting the 34 buses in question with a second bay would eliminate this problem, and would also permit wheelchair-bound persons to travel in groups of two. Installation of a second bay requires the removal of a seat for two persons. 9 Tr. 38–39.

The plaintiffs introduced evidence that in 1980 a second bay could have been added to a bus for approximately $1,000 without a significant loss of seating capacity. Pl. Ex. 5. However, Patrick Joyce testified that the cost of equipment used in installing a second bay would be only $200 and that the necessary labor could be performed in the RIPTA garage by maintenance personnel who are already on RIPTA's staff. 14 Tr. 48–49. As for seating, the evidence indicates that a second wheelchair bay could be added in conjunction with a three-person pop-up seat which would result in the loss of only one seat when the wheelchair bays are not in use. This seat would cost approximately $1,200 plus labor. 14 Tr. 48.

RIPTA, for its part, points out that its decision not to require a second wheelchair bay in the 34 buses in question was based on the low level of utilization it had experienced on the 19 buses with two bays that it already had. It contends that given the current level of use of lift-equipped buses, the chance of finding a wheelchair bay available is quite high, and the absence of a second bay thus should not be much of a deterrent to handicapped ridership. Finally, the Authority points out that the addition of a second bay will still not satisfy the desire mentioned by several handicapped witnesses to travel in groups of more than two. Such a need can only be met by paratransit.

A fourth problem raised by plaintiffs has already been touched upon. The plaintiffs object to RIPTA's scheduling policies with respect to lift-equipped buses. As was noted above, RIPTA's schedules indicate that there is virtually no accessible service available in the evening, and only very limited service on Saturday. *See* Def. Ex. N. There is no accessible service at all on Sundays. 17 Tr. 3–32. There is also no accessible service on a number of important routes. Of course, many of these schedul-

ing problems could be more readily dealt with if more lift-equipped buses were available or if a lower reserve ratio were maintained. It would thus appear that the problems of scheduling cannot be considered wholly apart from the other problems raised by plaintiffs.

### 3. *Accessible Service for the Semi-Ambulatory*

Although the principal focus of plaintiffs' suit has concerned RIPTA's denial of access to wheelchair users, the plaintiffs have also argued that RIPTA's policies deny meaningful access to the semi-ambulatory. This class of handicapped persons is made up of persons who are not confined to a wheelchair, but who find it difficult or impossible to climb stairs. The plaintiffs claim that RIPTA's service to this class of handicapped persons is deficient in two respects.

First, plaintiffs contend that RIPTA has made an insufficient effort to utilize effectively the kneeling feature found on its 111 most recently purchased buses. This feature, which lowers the entire right front of the bus, reduces the distance between the ground and the first step and makes it easier for the semi-ambulatory to get on and off the bus. 9 Tr. 76; 18 Tr. 18. Specifically, plaintiffs claim that RIPTA has failed to maintain adequately the 77 buses purchased with the kneeling feature in 1978. Plaintiffs also complain that it is impossible for riders and potential riders to identify which buses have the kneeling feature because neither the bus schedules nor markings on the buses themselves indicate which buses possess this feature.

Plaintiffs introduced convincing evidence of RIPTA's failure to maintain the kneeling features on the 77 buses purchased in 1978. None of the kneeling features on these buses was working as of April 1982. 14 Tr. 44. By the time of trial, between 10 and 21 of these buses had been repaired. 14 Tr. 7, 42. The difficulty with the feature stems from defective switches which General Motors has provided for the 1978 buses. 14 Tr. 6. General Motors has provided RIPTA with replacement parts and will pay for the approximately four hours of labor required to install each part. 14 Tr. 7. Nevertheless, the buses have remained unrepaired. RIPTA acknowledges the mechanical problems it has experienced with the kneeling device. Its officials testified, however, that RIPTA has been unable to spare either the labor hours or the time that buses would be out of service to make the necessary repairs. 14 Tr. 7.

Plaintiffs' second criticism of RIPTA's policies with respect to the semi-ambulatory concerns the use of wheelchair lifts. The plaintiffs point out that even if the kneeling feature were to function properly, it would not assure complete accessibility to the semi-ambulatory. The evidence indicates that even when the kneeling feature is used to reduce the distance between the ground and the first step, many semi-ambulatory persons still cannot negotiate the second step up into the bus. For example, Theresa Clark, who suffers from chronic arthritis, testified that it often is too painful for her to climb the steps leading into the bus. 14 Tr. 85. Pl. Ex. 2. The plaintiffs claim that the only way in which people like Mrs. Clark can effectively use RIPTA buses is to board and deboard the bus by way of the wheelchair lift. There was conflicting evidence over whether this would constitute a safe practice. Plaintiffs introduced a brochure which is distributed by General Motors, the manufacturer of the lifts, which indicates that the lifts may be safely used by standees. Pl. Ex. 22 at 5. Plaintiffs also introduced a report prepared for UMTA which states that elevator type lifts may be safely used by standees, while arc design lifts cannot be so utilized without creating safety hazards. Pl. Ex. 4 at 43. The evidence, however, does not clearly indicate whether RIPTA's lifts are elevator type or are design lifts. In addition, Miss Carol testified that semi-ambulatory persons can use the lifts on Seattle's buses without restriction. 11 Tr. 42. However, the lift used on Seattle's buses differs from that used on RIPTA's buses. 11 Tr. 36; 14 Tr. 5.

RIPTA produced two expert witnesses who testified that permitting non-wheelchair users to use the lifts would be unsafe. Professor Marc Richman, a professional engineer, testified that, based on his experience and observations of the equipment, it would be "unreasonably dangerous" for a non-wheelchair user to attempt to board or deboard the bus by way of the lift. 16 Tr. Faith Davis, chief physical therapist at Rhode Island Medical Center, General Hospital, also testified that it would be unsafe to permit persons with various types of handicaps to use the lifts. 18 Tr. 15. She indicated that some semi-ambulatory handicapped persons with training might be able to use the lifts, but it would be difficult for drivers to determine which persons fell within this limited category. She also pointed out that a driver could not assist a handicapped person who began to fall or who became caught in one of the pinch points on the equipment, because the driver must remain at the instrument panel to operate the equipment.

### 4. Planning

The plaintiffs' final complaint is that the defendants have made insufficient efforts to involve the handicapped in the mass transit planning process. They note that planning functions involving the handicapped have been carried out by two bodies. First, in 1978 RIPTA created an advisory body made up of individuals from the handicapped community which became known as the Handibus Committee. 10 Tr. 117. That Committee last met in December 1981, and its most recent meeting prior to that was in May 1980. 10 Tr. 117–18; Pl. Ex. 14. The State Planning Council also created a Committee on Transportation for the Elderly and Handicapped in early 1981. 15 Tr. 55. This Committee, meeting about a dozen times, has been more active than the Handibus Committee. *Id.* The Committee has yet to make a recommendation one way or the other with respect to the purchase of lift-equipped buses. 15 Tr. 61.

Plaintiffs particularly fault the lack of outreach to the handicapped community by RIPTA. They concede that the Authority has prepared a brochure which tells wheelchair users how to use lift-equipped buses, and that it designates wheelchair accessible runs on its schedules. RIPTA, however, has apparently not sought to demonstrate to mobility handicapped groups how to use lift-equipped buses, although something similar to this was done for the visually impaired. *See* 10 Tr. 137–38. The plaintiffs also point out that none of the defendants have attempted to survey the handicapped community to determine their transportation needs or how these needs could best be served.

RIPTA points to the minutes and working papers of the State Planning Council's Committee on Transportation for the Elderly and Handicapped which reveal a substantial amount of activity on the part of the Committee. Pl. Ex. 6 and 25. RIPTA has notified agencies that deal with the handicapped of the services it provides. 10 Tr. 134. In addition, RIPTA provides free rides to the handicapped during non-rush hours weekdays and all day Saturdays and Sundays. 10 Tr. 133. The defendants insist that the problems raised by the need for transportation for the handicapped and elderly are extremely complex and technical, and that these problems are interrelated with a myriad of other public policy concerns. These problems are currently the focus of planning efforts and a report by the Committee on Transportation of the Elderly and Handicapped is expected in September 1982. 15 Tr. 69. The defendants contend that these planning efforts more than satisfy any requirement under federal law.

### DISCUSSION

### I. Rehabilitation Act Claim

#### A. Scope of § 504

Plaintiffs' principal claim in this suit is that RIPTA's proposed purchase of 42 new buses without wheelchair lifts would violate their rights under § 504 of the Rehabilitation Act. Section 504 provides that no "otherwise qualified" handicapped person

may, "solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program . . . receiving Federal financial assistance." 29 U.S.C. § 794.[3] Although § 504 does not expressly grant plaintiffs a right to enforce the statute in court, this Court has previously held that handicapped persons have an implied private cause of action to enforce § 504. *Turillo v. Tyson,* 535 F.Supp. 577, 584–85 (D.R.I.1982). *Accord Colin K. v. Schmidt,* 536 F.Supp. 1375, 1388 (D.R.I. 1982). Defendants do not question this holding. Thus the only issue in this case is whether the defendants have violated the provisions of § 504.

The defendants seek to rely on the Supreme Court's decision in *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) to establish that they are in compliance with § 504. In *Davis,* the plaintiff was denied admission to the nursing program at Southeastern Community College because a hearing disability prevented her from participating safely in the normal clinical training program. The Court held that the defendant college had not violated § 504 in refusing to admit the plaintiff to its registered nursing program since she was not "otherwise qualified" to participate in that program. *Id.* at 406, 99 S.Ct. at 2367. Because enrolling the plaintiff in the school's nursing program would have required a "fundamental alteration in the nature" of the program, the Court found that Southeastern's conduct was reasonable and nondiscriminatory. *Id.* at 410, 99 S.Ct. at 2369.

· *Davis* is of little help to the defendants in this case. Here, there is no question whether the handicapped plaintiffs are "qualified" for riding public transportation; there simply are no qualifications for riding a bus. Nor is there any concern in this case, as there was in *Davis,* that the participation of the handicapped may result in harm to third persons. The handicapped plaintiffs seek to ride a bus, not to qualify as its driver. In short, *Davis* holds only that § 504 does not compel educational institutions to modify substantially existing programs to permit the participation of the handicapped. It does not define the scope of § 504 in contexts in which the handicapped are admittedly "qualified" to participate.

The defendants also contend that the purchase of 42 buses without wheelchair lifts does not violate § 504 because of the command in *Davis* that "neither the language, purpose, nor history of § 504 reveals an intent to impose an affirmative-action obligation on all recipients of federal funds." *Southeastern Community College v. Davis,* 442 U.S. at 411, 99 S.Ct. at 2369. *Davis'* refusal to require Southeastern Community College to fashion an affirmative-action admissions program for the handicapped, however, has little bearing on the requirements of § 504 in the mass transit context. *See American Public Transit Ass'n v. Lewis,* 655 F.2d 1272, 1281 (D.C.Cir.1981) (Edwards, J., concurring). As the Second Circuit Court of Appeals recently said in *Dopico v. Goldschmidt,* 687 F.2d 644 at 652 (2d Cir. 1982):

[i]n the context of public transportation and handicapped, denial of access cannot be lessened simply by eliminating discriminatory selection criteria; because the barriers to equal participation are physical rather than abstract, some sort of action must be taken to remove them,

---

**3.** Section 504 provides:

No otherwise qualified handicapped individual in the United States, as defined in section 7(7) [29 U.S.C. § 706(7)], shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of

each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

if only in the area of new construction or purchasing.

Unlike *Davis,* where the relief sought would have required a major restructuring of the school's nursing program, here RIPTA's program would not be changed in a fundamental way; RIPTA is merely being asked to purchase 42 new buses equipped with wheelchair lifts and to maintain and use effectively buses already equipped to service the handicapped. This would not require RIPTA to take "affirmative action" by substantially modifying its existing programs. It would only require RIPTA to refrain from discriminating against the handicapped in its upcoming purchase of buses and the management of its fixed route transport system.

This Court previously noted in *Turillo v. Tyson* that the Supreme Court in *Davis* did not fashion a general rule for implementing the non-discrimination mandate of § 504. To fill this gap, *Tyson* devised a two-tier analysis for applying § 504. First, it must be determined whether the defendant is being asked to provide the plaintiff with a completely new service or program, or with modifications of an existing service or program to permit the plaintiff to participate in, or benefit from, the service or program. *Turillo v. Tyson,* 535 F.Supp. at 587. *Accord Colin K. v. Schmidt,* 536 F.Supp. at 1388. If, and only if, modification of an existing program is involved, then the Court must decide whether the requested modifications impose "undue" financial and administrative burdens on the defendant. *Turillo v. Tyson,* 535 F.Supp. at 587. *Accord Colin K. v. Schmidt,* 536 F.Supp. at 1388.

The plaintiffs have easily satisfied the first tier of the *Tyson* test. With the help of subsidies from the federal government, RIPTA operates a fixed route bus system to provide transportation to the public. Plaintiffs wish to utilize that system. They do not seek special paratransit routes or the redrawing of routes to provide them with greater convenience. Plaintiffs merely want to use a publicly funded service in the same way able-bodied persons use it.

The second tier of the *Tyson* test requires a more complicated analysis. Here, the critical issue is whether the benefits of a program receiving Federal financial assistance are denied a handicapped person "solely by reason of his handicap." 29 U.S.C. § 794. This inquiry necessarily involves balancing the overall costs and benefits, both long and short range, that the relief would confer on both the plaintiff and the defendant. If the overall costs are reasonable in light of the anticipated benefits, and the burdens imposed are not "undue," then it can be reasonably concluded that the handicapped have suffered discrimination solely by reason of their handicap and that relief should be granted under § 504. *Cf. Majors v. Housing Auth.,* 652 F.2d 454, 457 (5th Cir. 1981) ("the holding in [*Davis*] . . . must be considered in the context of whether *reasonable* accommodations will permit the handicapped . . . to realize the principal benefits of the program." (emphasis added)).[4]

The complexity of determining how much accommodation is called for by § 504 is illustrated by the confusing and tumultuous history of the regulations implementing the three major statutes that pertain to the use of mass transit by the handicapped—the Urban Mass Transportation Act, 49 U.S.C. § 1612(a), the Federal-Aid Highway Act, 23 U.S.C. § 142, and the Rehabilitation Act of 1973, 29 U.S.C. § 794. The first set of regulations appeared in 1976 and required that federally funded programs must make "special efforts" in accommodating the handicapped. *See* 49 C.F.R. Parts 609 and 613 (incorporating provisions now appearing

---

**4.** The Second Circuit has interpreted § 504 as requiring a recipient of federal funds to show a "substantial justification" for not accommodating a handicapped individual in a particular program. *Kampmeier v. Nyquist,* 553 F.2d 296, 299 (2d Cir. 1977) (on motion for preliminary injunction); *Lynch v. Maher,* 507 F.Supp. 1268, 1279 (D.Conn.1981). Although this Court has not explicitly adopted the Second Circuit standard, the Court notes that the balancing process of the *Turillo* analysis incorporates, to a large extent, the Second Circuit's substantial justification inquiry.

at 23 C.F.R. Part 450 (1981)). The second set of regulations, which were issued in 1979, imposed far more rigorous requirements on the recipients of federal funds. *See* 49 C.F.R. Part 27 (1980). These regulations superceded the 1976 regulations and mandated that each mode of public transportation be made accessible to the handicapped. Additionally, the regulations demanded compliance with specific goals and timetables. For example, they required that every bus purchased after July 2, 1979, be equipped with a wheelchair lift, and that within ten years of the effective date of the regulations, half of the buses on every system be wheelchair accessible.

The validity of the 1979 regulations was undermined by the decision of the Court of Appeals for the District of Columbia in *American Public Transit Ass'n v. Lewis,* 655 F.2d 1272 (D.C.Cir.1981). That decision held that the 1979 regulations could not be sustained under § 504. The regulations, concluded the court, demanded "the kind of burdensome modifications that . . . *Davis* . . . held to be beyond the scope of § 504." *Id.* at 1278. Section 504 does not justify rules that "require extensive modifications of existing systems and impose extremely heavy financial burdens on local transit authorities." *Id.*

Two months after the decision in *APTA,* the Department of Transportation (DOT) promulgated new regulations governing access to public transportation for the mobility handicapped. 46 Fed.Reg. 37484 (July 20, 1981), *codified at* 49 C.F.R. § 27.77. Reverting back to the vague terminology of the 1976 regulations, these regulations provide that recipients of UMTA funds are in compliance with § 504 if they certify "that special efforts are being made in their service areas to provide transportation that handicapped persons, including wheelchair users and semi-ambulatory persons, can use." 49 C.F.R. §§ 27.77(a)(1), (a)(4) (1981). Although they do not prescribe any "regulatory standards or minimums," the regulations do set forth three illustrative examples of sufficient special effort. 49 C.F.R. § 27.77 Appendix A (1981). The first of these examples permits a recipient to comply with the special efforts requirement by making an average annual expenditure of 3.5 percent of the funds made available to the recipient under § 5 of the UMT Act, 49 U.S.C. § 1604.

Thus, within the five year period from 1976–1981, the regulations interpreting § 504 have varied widely in their evaluation of the extent to which recipients of federal funds for mass transportation must accommodate the handicapped. What emerges from the history of the regulations are only the outer limits of the degree of accommodation that is called for by § 504. On the one hand, *Davis* and *APTA* make clear that § 504 does not require "massive" expenditures. *Southeastern Community College v. Davis,* 442 U.S. at 412, 99 S.Ct. at 2370; *American Public Transit Ass'n v. Lewis,* 655 F.2d at 1278. On the other, the emphasis of all three regulations on making "special efforts" to accommodate the handicapped makes it equally clear that § 504 is not a hollow promise. As the Second Circuit recently observed: The question posed by § 504

is one of the degree of effort necessary rather than whether any effort at all is required. When Congress legislates to require accommodating federally funded mass transportation systems to the needs of the handicapped, and regulations specify that fund recipients must use their available funds to make some "special efforts" toward the national policy that Congress has established, courts are obliged to adjudicate claims that the law is not being observed.

*Dopico v. Goldschmidt,* 687 F.2d 644, 653 (2d Cir. 1982). While this Court is keenly aware of the difficulty in defining precisely the degree of accommodation required by § 504, it nevertheless agrees with the Second Circuit that it cannot be deterred by the difficulty of this task from enforcing the policy declared by Congress.

The defendants contend that this Court's task is a simple one; they argue that the Court is compelled to defer to the 3.5 percent guideline in the 1981 regulation,

46 Fed.Reg. 37487 (July 20, 1981), *codified at* 49 C.F.R. § 27.77, in determining RIPTA's obligations under § 504. Since the parties have stipulated that RIPTA has met the 3.5 percent guideline, defendants claim they are entitled to a judgment in their favor on the § 504 claim. This Court disagrees.

"Although an agency's interpretation of the statute under which it operates is entitled to some deference, 'this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history.'" *Southeastern Community College v. Davis,* 442 U.S. at 411, 99 S.Ct. at 2369, citing *Teamsters v. Daniel,* 439 U.S. 551, 556, 99 S.Ct. 790, 794, 58 L.Ed.2d 808 n. 20 (1979). *Accord F.E.C. v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1982).[5] This Court's interpretation of § 504 is broader than that contained in the 1981 regulation. *Cf. Baker v. Bell,* 630 F.2d 1046, 1056–57 (5th Cir. 1980) (suggesting that scope of § 504 private right of action not bound by agency regulations). Although expenditure of 3.5 percent of its § 5 funds for assuring access for the mobility handicapped to public transportation might, in some circumstances, satisfy a recipient's obligations under § 504, in other circumstances more is required.

To evaluate whether in the present case § 504 requires the defendants to do more than meet the 3.5 percent guideline, three factors must be considered. First, it is necessary to assess the history of RIPTA's efforts to provide transportation for the handicapped. Second, it must be considered whether using the funds in a different way than that proposed by RIPTA would actually benefit the handicapped. Finally, the administrative and financial costs of accommodating the handicapped must be examined.

RIPTA's attempts to provide meaningful public transportation for the handicapped of Rhode Island have been inadequate. Only 53 out of RIPTA's fleet of 267 buses, approximately 20 percent, are currently accessible to wheelchair users, and the proposed purchase of 42 new buses which do not contain wheelchair lifts would further reduce this percentage. The cost to the handicapped of this shortage has been substantial; many important routes remain completely inaccessible and there is virtually no service for the handicapped in the

**5.** The unusual history of 49 C.F.R. § 27.77 also counsels against according it much deference. A regulation is of particular validity "when it involves a contemporaneous construction of a statute," *Norwegian Nitrogen Products Co. v. U.S.,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933), and represents a consistent interpretation of the statute. *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). *See F.E.C. v. Democratic Senatorial Campaign Comm.,* 102 S.Ct. at 44; *Adamo Wrecking Co. v. U.S.,* 434 U.S. 275, 287 n. 5, 98 S.Ct. 566, 574 n. 5, 54 L.Ed.2d 538 (1978). The DOT regulation here meets neither criterion. It is the third set of federal regulations concerning access for the mobility handicapped to public transportation within 5 years. Additionally, it differs dramatically from the 1979 regulation, which would have required every bus purchased after July 2, 1979 to be equipped with a wheelchair lift. *See* 49 C.F.R. Part 27 (1980).

Further reducing the controlling force of the regulation is its stopgap nature. Regulations are generally issued pursuant to the rulemaking provisions of the Administrative Procedure Act. *See* 5 U.S.C. § 553. This Act provides for a notice and comment period: the agency publishes a notice of proposed rulemaking, interested persons comment on the proposal, and the agency considers these comments before promulgating the final regulations. These procedures "were designed to assure fairness and mature consideration of rules of general application." *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 764, 89 S.Ct. 1426, 1428, 22 L.Ed.2d 709 (1969). DOT did not comply with these procedures in promulgating 49 C.F.R. § 27.77. Understandably, the Department wanted to fill the void left by the invalidation of the 1979 regulations in *APTA.* It therefore denoted its new regulation as an "interim final rule" and made it effective immediately. 46 Fed. Reg. 37487, 37491. (July 20, 1981). The Department requested the submission of comments by September 18, 1981 and announced its intention to publish a notice of proposed rulemaking after reviewing these comments. *Id.* Almost a year later, DOT has yet to publish those proposed rules. In light of the erratic history of these regulations and the interim nature of the current regulation, this Court feels unconstrained to follow DOT's interpretation of § 504.

evenings or on weekends. Because of the limited accessibility of the present fixed route transportation system, its use by wheelchair users in the past has been negligible.

Defendants have sought to justify their actions by pointing to their free ride program and the paratransit services provided to handicapped persons. These are certainly commendable programs, but they do not help defendants in this case. Free bus rides are of little value to a person who cannot get on the bus. Paratransit service in Rhode Island is inadequate. At its best, it requires users to make their travel plans well in advance. Able-bodied patrons of RIPTA are not required to wait up to one week from the time they decide to travel to the time they actually do travel; there is no reason why mobility impaired persons should be required to tolerate this major restriction on their ability to use public transportation. Moreover, even those witnesses who thought accessible fixed route transportation should take second place to paratransit agreed "that right now [the] paratransit system in Rhode Island is no means of getting around." Testimony of John Gaffney, 16 Tr. 2–35; testimony of Hugh Gallagher, 21 Tr. 26–27.[6]

RIPTA's planning and scheduling have further exacerbated the problems caused by its shortage of accessible buses and lack of funding for paratransit service. Less than half of RIPTA's lift-equipped buses are today used on accessible routes. RIPTA's persistent use of accessible buses on non-accessible routes seems particularly unjustified in light of the relatively small number of buses and routes that can be presently utilized by the handicapped. Equally trou-

blesome is the fact that RIPTA has consistently maintained a much higher reserve ratio for lift-equipped buses than for buses without wheelchair lifts. In fact, RIPTA's current reserve ratio for lift-equipped buses (53%) is nearly five times the ratio it maintains for its newer, non-accessible buses. This disparity is too great to be explained by the added complexity of the lift-equipped buses. In light of RIPTA's record of poor planning, misuse of existing resources, and its refusal to include the handicapped in its proposed purchase of new buses, it is not surprising that many of Rhode Island's handicapped view RIPTA's efforts to accommodate their needs as merely "token."

It is only against the background of the history of RIPTA's efforts to accommodate the handicapped that the modifications sought by the plaintiffs can be understood. Where, as here, a transportation system has spurned reasonable proposals to accommodate the handicapped and leaves the handicapped stranded without access to reliable and efficient service, then the benefit of proposals to modify the existing system must be analyzed with a compassionate eye. This does not mean, of course, that making public transportation accessible to the handicapped is worth any cost. Section 504 requires neither "massive" expenditures nor modifications that would result in "undue" administrative burdens. *Southeastern Community College v. Davis,* 442 U.S. at 412, 99 S.Ct. at 2370; *American Public Transit Ass'n v. Lewis,* 655 F.2d at 1278. Thus, even if the benefit to the handicapped of a modification to an existing transportation system would be substantial, § 504

---

**6.** Defendants argue that the money saved by not placing lifts on the 42 buses can be applied to other programs to aid the handicapped. Defendants have tried to convey the impression that the expenditure of money on wheelchair lifts means less money for paratransit. RIPTA's general manager testified that the federal grant from UMTA was meant to cover the cost of 42 buses with lifts, and any difference between the amount of the federal grant and the amount expended on 42 buses without lifts can be transferred to other transportation programs. 17 Tr. 3–25—3–32.

The problem with defendants' argument is twofold. First, even if the entire $340,788 is applied to paratransit, this would not necessarily fulfill defendants' duties under § 504 because wheelchair users still would be excluded from RIPTA's fixed route system. Second, there is absolutely no assurance from defendants that any of the funds saved by not purchasing wheelchair lifts will be applied to programs for the handicapped. Without such an assurance, defendants' argument that paratransit services should receive priority over fixed route service is irrelevant.

does not require that it be instituted if doing so would jeopardize the effectiveness of that transportation system in any serious way.

While this Court is confident that the record before it provides compelling proof that the defendants have discriminated against the handicapped in the operation of its fixed route transport system, it does not believe that there is any magical formula that can be used to determine precisely what modifications of RIPTA's existing program are required by § 504. It simply is not possible to quantify in a precise fashion the number of wheelchair accessible buses that RIPTA is required to purchase or retrofit. Nor is it possible with any mathematical certainty to decide on the number of accessible routes that § 504 requires. Nevertheless, as the Second Circuit so aptly observed, the difficulty of fashioning relief in this area, does not justify abandoning the task. *Dopico v. Goldschmidt,* 687 F.2d 644, 653 (2d Cir. 1982).

In considering what modifications of RIPTA's fixed transport system are required by § 504, the Court has relied in part on the evidence presented by the plaintiffs on the Seattle fixed transport system. Since the Seattle system is a success by all accounts, it provides a useful model against which to compare proposed modifications of the RIPTA system.

Plaintiffs make several claims relating to RIPTA's use of equipment it already owns and the way in which RIPTA administers its fixed transport system. Modification of RIPTA's fixed transport system to accommodate the plaintiffs with regard to these claims will involve little or no financial and administrative costs. The Court will thus dispose of these claims before considering the claims involving more significant costs to the defendants.

■ First, plaintiffs claim that RIPTA's low utilization of lift-equipped buses it already owns on accessible routes violates § 504. The evidence shows that less than half of RIPTA's lift-equipped buses are today used on accessible routes. RIPTA has consistently maintained a much higher reserve ratio for lift-equipped buses than for non-lift equipped buses. RIPTA's general manager admitted at trial that ten more lift-equipped buses could be put into service on accessible lines. These lift-equipped buses could be put into service on accessible lines at little cost to the state. RIPTA's failure to do so is inexcusable. I hold that RIPTA's maintenance of an excessively high reserve ratio of accessible buses violates § 504.

Plaintiffs request that defendants be ordered to maintain the same reserve ratio for lift-equipped buses that is used for other new buses: 10 to 12 percent. Defendants contend that a much higher reserve ratio is required for lift-equipped buses because a lift is an additional piece of complex equipment that can break down, and because RIPTA can replace a broken non-lift-equipped bus with any bus in its fleet, but can only replace a lift-equipped bus on an accessible route with another lift-equipped bus. RIPTA's director of maintenance, however, testified that lift-equipped buses do not require a higher reserve ratio than non-lift-equipped buses.

I conclude that RIPTA shall maintain no more than a 15 percent reserve ratio for its lift-equipped equipment. It is, of course, essential that a lift-equipped bus be used on all designated wheelchair routes. Holding 15 percent of its lift-equipped buses in reserve is adequate for that purpose. The Seattle bus system has operated on that basis, and the Court finds that RIPTA's system can as well. If for some reason it develops that RIPTA cannot provide reliable service with this reserve ratio, it may apply to the Court for a modification of this portion of the decision.

■ Second, plaintiffs claim that RIPTA violates § 504 by not providing a locking mechanism in its wheelchair bays that will work on electric wheelchairs. Plaintiffs presented evidence that this problem can be rectified by the installation of inexpensive cargo straps. It is not surprising that defendants presented no evidence justifying their failure to provide access for electric

wheelchair users; the Court finds this failure to be indefensible. RIPTA is ordered to provide some form of locking device for electric wheelchairs.

Third, plaintiffs request that defendants be ordered to repair the kneeling features on the approximately 60 buses on which the feature is not operating. It is important that the kneeling features be in good working order because they make it considerably easier for a semi-ambulatory person to climb the steps leading into a bus. According to RIPTA, General Motors has provided it with replacements for the defective parts responsible for the malfunctioning of the kneeling features. General Motors has also agreed to pay for the labor required to install the parts. The only reason the work has not been done is that RIPTA claims to be unable to spare the approximately four hours of labor time per bus required to replace the defective part.

█ The Court finds RIPTA's explanation to be totally inadequate. The kneeling feature has been out of operation on these buses for at least two years. RIPTA will be reimbursed by General Motors for its labor costs in making the repairs. If RIPTA cannot manage the job with its present labor force, then it can hire additional labor to perform the repairs. The Court orders RIPTA to repair all kneeling features within 90 days of the issuance of this opinion.

█ Plaintiffs also challenge RIPTA's policy of not permitting semi-ambulatory persons to use wheelchair lifts on the buses that are so equipped. RIPTA submitted the testimony of two expert witnesses who felt that use of these lifts by semi-ambulatory persons was unreasonably dangerous. Plaintiffs presented no testimony concerning the safety of these lifts for semi-ambulatory persons. Plaintiffs only provided the Court with a General Motors brochure indicating that the lifts are safe, and an UMTA manual which states that one kind of lift is safe for standees, while another kind is not.

This latter document is singularly unhelpful, because the Court does not know which kind of lift General Motors manufactures. The weight of the evidence, therefore, clearly indicates that RIPTA's decision not to allow standees to use the wheelchair lifts is justified.[7]

█ Fourth, plaintiffs challenge RIPTA's scheduling policies regarding wheelchair accessible routes. The Court holds that RIPTA clearly violates § 504 when it declines to provide any accessible service on Sundays and in the evenings. Such service is important to creating a bus system upon which the handicapped can rely. The Court realizes that RIPTA only changes its schedules every four months. 17 Tr. 3–21—3–25. Nevertheless, there is no reason why, more than a year after receipt of the 34 buses, RIPTA has scheduled only half of them on accessible routes. The Court orders RIPTA to adjust its schedule more rapidly in the future, and also orders Sunday and evening accessible service to be instituted.

Fifth, plaintiffs request the Court to order defendants to consult more closely with the handicapped community and to plan more coherently for the transportation needs of the mobility impaired. The evidence submitted by plaintiffs does indicate that defendants are doing less than they should in terms of planning for the needs of the handicapped. Certainly, two meetings of the Handibus Committee does not compare favorably with the extensive planning engaged in by the Seattle transportation authorities.

The Court urges RIPTA to expand its planning for the needs of the handicapped. Consultation with the handicapped community can help make this planning effort more successful. Throughout the trial, it was apparent that handicapped individuals were unaware of services offered by RIPTA, while RIPTA was unaware of some needs of plaintiffs. Some of plaintiffs' claims could have been settled without the

---

**7.** Although the Court will not order RIPTA to allow semi-ambulatory persons to use the lifts, it urges RIPTA to find some way in which standees can safely use the lifts. Plaintiffs did show that some semi-ambulatory persons will be able to use RIPTA's buses only if they can use the lifts, and the Court believes they should be accommodated if possible.

necessity of a trial. Accessible equipment is only good so long as it is properly utilized. Planning is thus beneficial for all parties.

The Court will not, however, order defendants to involve the handicapped in the planning process. Defendants have a duty under § 504 to avoid discriminating against the handicapped; if they can comply with § 504 without the participation of the handicapped in the planning process, that is their prerogative.

In addition to the claims just discussed, the plaintiffs seek several modifications in RIPTA's fixed route bus system that would involve more substantial costs to the State. The most significant of these is the plaintiffs' request that the 42 buses about to be purchased by RIPTA be equipped with wheelchair lifts. The cost of a lift on a General Motors bus is $8,114, or about 5 percent of the purchase price of a new bus. The total cost of putting lifts on all 42 buses is $340,788. The maintenance of the lift equipment would require some minor additional costs. The question presented by this requested modification in RIPTA's fixed route transport system is whether the benefits of the purchase to the handicapped outweigh the financial expense that would be incurred by the State.

The purchase of 42 new lift-equipped buses, together with the 53 lift-equipped buses already operated by RIPTA and the five articulated buses about to be delivered, would give RIPTA 100 wheelchair accessible buses. This would mean that approximately 37 percent of all RIPTA buses would be accessible as compared to the approximately 33 percent of Seattle buses that are wheelchair equipped. The addition of 42 lift-equipped buses to RIPTA's fleet would, therefore, provide at least the opportunity for meaningful access to public transportation for the wheelchair users of Rhode Island.

Increased accessibility, however, is significant only if the system is actually utilized by wheelchair users. It is regrettable that the record does not contain any hard data demonstrating the extent to which ridership will increase by making more of RIPTA's buses accessible. The Court is left to search through the record to determine for itself whether the increase in ridership will be significant. Fortunately, the record permits the drawing of some conclusions on this issue.

First, I find that there are approximately 4,300 wheelchair users in the State. Although the census that generated this number may not have been perfect, this number is consistent with the national figure of 800,000 wheelchair users. Moreover, defendants have not offered any other figure for the Court's perusal.

Second, I find that most wheelchair users are capable of using a fixed route bus system. Undoubtedly, some wheelchair users are mentally or physically incapable of traveling alone on a fixed route bus system, but the overwhelming weight of the testimony demonstrated that almost all wheelchair users can effectively use a fixed route bus system.

Third, I find that a significant proportion of those wheelchair users who can use a fixed route bus system will in fact do so. This finding is consistent with that of the Rhode Island House of Representatives, which found that 3,000 wheelchair users will want to use RIPTA's buses. In the face of this data and common sense, this Court cannot accept RIPTA's argument that the negligible past ridership by wheelchair users is indicative of future negligible ridership. RIPTA's inadequate provision of accessible service is largely responsible for the low handicapped ridership; its past record of insufficient efforts on behalf of the physically disabled does not justify its refusal to provide adequate service today.

Significantly, the experience of the Seattle bus system indicates that increased accessibility to the handicapped will result in increased ridership by the handicapped. As more accessible buses and routes were added to Seattle's transportation system, wheelchair user ridership increased dramatically. Miss Carol of the Seattle bus system explained that an increase in accessible routes leads to an increase in ridership of an even greater magnitude because of the im-

portance of transferring from route to route within the system. Even RIPTA's own limited experience indicates that improved accessibility will increase the number of handicapped riders. After RIPTA added 8–9 buses to its accessible routes in January of this year, ridership expanded 37 percent over the last year.

As indicated by the evidence presented by the plaintiffs, meaningful access to the public transportation system will benefit the handicapped in many ways. Wheelchair users who will now, for the first time, be permitted to travel on their own can be expected to develop the independence necessary for them to become participants in the social, economic and political affairs of the community. Today many of the 4,300 wheelchair users in Rhode Island are deprived of an opportunity to contribute to society solely because they are isolated in their homes. Society will surely be enriched by their participation in the work force and in the cultural life of the community.

■ The costs of adding 42 lift-equipped buses to RIPTA's fleet are not insubstantial. They are more than enough to pay for two additional non-accessible buses. Nevertheless, the Court cannot say that two additional buses for the able-bodied public are more important than 42 buses that wheelchair users, as well as the general public, can use. The cost of remedying the discrimination against the handicapped simply cannot be called "massive" or "undue." What is sought here is a far cry from the "major overhauling of the transit system" that the plaintiffs unsuccessfully sought in *Dopico v. Goldschmidt,* 518 F.Supp. 1161, 1176 (S.C.N.Y.1981) *aff'd in part, rev'd in part,* 687 F.2d 644 (2d Cir. 1982). I therefore hold that RIPTA shall purchase the 42 buses complete with wheelchair lifts.

Plaintiffs' final claim involves equipping RIPTA's accessible buses with two wheelchair bays. Specifically, plaintiffs request that RIPTA install a second wheelchair bay

in the 34 lift-equipped buses received in 1981 as well as in the 42 new buses it is about to purchase. The benefit of buses being equipped with two wheelchair bays is twofold. First, it creates an incentive for wheelchair users to use mass transportation by making it more likely that a seat will be available for them. Second, it makes it possible for wheelchair users to travel in pairs. This also could increase the attractiveness of traveling by bus for wheelchair users. The cost of equipping the 42 new buses with a second wheelchair bay is only $139 per bus. The cost of putting in a new bay and a three person pop-up seat in the 34 buses purchased in 1981, however, is $1,200 plus labor.

■ This Court holds that the cost of $139 per bus for the 42 new buses about to be purchased is insubstantial when compared to the benefit of having those buses equipped with two bays. Accordingly, the Court orders that the 42 lift-equipped buses be purchased with two wheelchair bays. The Court does not believe, however, that the cost of retrofitting the 34 buses purchased in 1981 justifies the expense of $1,200 plus labor per bus. Assuming the 42 new buses have two bays, sixty-six of RIPTA's accessible buses will be so equipped. This should provide sufficient assurance to wheelchair users that they will be able to board a bus with a free bay without waiting an unduly long time. After the new buses are in service, RIPTA will be able to forecast which routes are more likely to have two wheelchair-bound riders. RIPTA can then put the buses with two bays on those routes. This should provide sufficient accessible service without imposing any undue costs on the defendants.

*Additional Claims for Relief*

Plaintiffs make three additional claims for relief. First, they assert that defendants have violated § 16(a) of the Urban Mass Transportation Act.[8] Second, they

---

**8.** Section 16(a) provides:

(a) *Congressional declaration of policy.* It is hereby declared to be the national policy that

elderly and handicapped persons have the same right as other persons to utilize mass transportation facilities and services; that

claim that defendants have denied them the equal protection of the laws guaranteed by the Fourteenth Amendment. Third, plaintiffs assert that the local defendants have violated Rhode Island General Laws § 40–9.1–1.[9] All three claims present difficult issues.

Section 16(a) of the UMT Act is a declaration of the "national policy" that "handicapped persons have the same right as other persons to utilize mass transportation facilities and services," and that "special efforts" must be made in the planning of these services so that handicapped persons "can effectively utilize" them. 49 U.S.C. § 1612(a). It has been held that this statute does not create enforceable private rights, *Dopico v. Goldschmidt,* 518 F.Supp. at 1177–78 *aff'd in part, rev'd in part,* 687 F.2d 644 (2d Cir. 1982) a holding which would deny plaintiffs any right of action against the local defendants. *See Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 1545 n. 21, 67 L.Ed.2d 694 (1981). The federal defendants have not violated § 16(a) unless the regulations which they have adopted calling for the expenditure of 3.5 percent of federal funds received under § 5 of the UMT Act on programs for the handicapped, *see* 49 C.F.R. § 27.77 Appendix A, are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Considering

the broad language of the statute, this would be difficult to demonstrate.

Plaintiffs eschew any argument that defendants' acts must be strictly scrutinized because handicapped persons constitute a suspect class. *See Dopico v. Goldschmidt,* 518 F.Supp. at 1178 *aff'd in part, rev'd in part,* 687 F.2d 644 (2d Cir. 1982) (holding that handicapped persons do not constitute a suspect class); *Sherer v. Waier,* 457 F.Supp. 1039, 1047 (W.D.Mo.1978) (same). Rather, they argue that transportation is so important to the handicapped that any denial of access to public transportation must be closely examined. Plaintiffs urge that we adopt the sliding scale equal protection analysis advocated by Justice Marshall. *See, e.g., Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 317–327, 96 S.Ct. 2562, 2568–2573, 49 L.Ed.2d 520 (1976) (Marshall, J., dissenting). That analysis, plaintiffs say, requires RIPTA to purchase lift-equipped buses.

Finally, plaintiffs request that this Court construe R.I.G.L. § 40–9.1–1 to require the purchase of lift-equipped buses. This statute expresses the policy of the State to assist the handicapped in all fields, including public transportation. The statute has never been construed by a Rhode Island court. Further, the statute does not expressly provide for a cause of action to enforce its provisions, and the Rhode Island Supreme Court has not devised a rule for

special efforts shall be made in the planning and design of mass transportation facilities and services so that the availability to elderly and handicapped persons of mass transportation which they can effectively utilize will be assured; and that all Federal programs offering assistance in the field of mass transportation (including the programs under this Act [49 U.S.C. § 1601 et seq.]) should contain provisions implementing this policy.
49 U.S.C. § 1612(a).

**9.** This statute provides:
Declaration of policy.—It is the policy of this state to encourage and enable the blind, the deaf, the visually handicapped, and the otherwise physically disabled to participate fully in the social and economic life of the state and to engage in remunerative employment; to be employed in the state service, the service of the political subdivisions of the state, in the public schools, and in all other employ-

ment supported in whole or in part by public funds on the same terms and conditions as the able-bodied unless it is shown that the particular disability prevents the performance of the work involved; to have the same right as the able-bodied to the full and free use of the streets, highways, sidewalks, walkways, public buildings, public facilities and other public places; (are) to be entitled to full and equal accommodations, advantages, facilities, and privileges of all common carriers, airplanes, motor vehicles, railroad trains, motor buses, street cars, boats or any other public accommodation, amusement or resort, and other places to which the general public is invited, subject only to the conditions and limitations established by law and applicable alike to all persons.
R.I.G.L. § 40–9.1–1.

the implication of a private cause of action from a Rhode Island statute. The difficulty presented a federal court by this claim is manifest.

The Court finds it unnecessary to decide any of these hard questions. Plaintiffs have received most of the relief that they requested under § 504. It does not appear that they could receive any greater relief under any of the other claims. Therefore, the Court will not adjudicate any of these claims.

### Conclusion

The Court has concluded that plaintiffs are entitled to relief under section 504 of the Rehabilitation Act. As to the purchase of the 42 buses, the federal defendants have indicated their willingness to let these buses be equipped with wheelchair lifts. Therefore, judgment will be entered for the federal defendants on all claims.

The Court also holds that defendants Rhode Island Statewide Planning Program and Statewide Planning Council are entitled to a judgment in their favor. Although these organizations have perhaps been less than zealous in planning for the transportation needs of handicapped persons, the Court has not found that these defendants violated the law. Further, these agencies are not responsible for the procurement policies of RIPTA. Judgment will be entered in their favor.

Defendant RIDOT is a large state agency which, among other things, is in charge of RIPTA. Therefore, judgment must be entered both against RIDOT and RIPTA. These defendants are hereby enjoined:

1) to purchase 42 buses with wheelchair lifts and two wheelchair bays;

2) to maintain no more than a 15 percent reserve ratio for its lift-equipped buses;

3) to provide a locking mechanism which will secure electric wheelchair users;

4) to provide meaningful wheelchair accessible bus service on weekends and in the evenings; and

5) to repair the kneeling features on all its buses within 90 days of this opinion.

The plaintiffs will prepare an Order in accordance with this opinion.