RHODE ISLAND HANDICAPPED
ACTION COMMITTEE, et al.,
Plaintiffs, Appellees,

v.

RHODE ISLAND PUBLIC TRANSIT
AUTHORITY, et al., Defendants,
Appellants.

No. 82–1771.

United States Court of Appeals,
First Circuit.

Argued March 10, 1983.

Decided Sept. 29, 1983.

Anthony F. Muri, Providence, R.I., with whom Susan M. Huntley, and Levy, Goodman, Semonoff & Gorin, Providence, R.I., were on brief, for defendants, appellants.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., Lincoln C. Almond, U.S. Atty., Providence, R.I., William Kanter, Atty., Civ. Div., Dept. of Justice, John F. Cordes, Atty., Civ. Div., Dept. of Justice, Trudy B. Levy, Asst. Chief Counsel, Dept. of Transp., and Michael L. Martinez, Attorney-Advisor,

Dept. of Transp., Washington, D.C., on brief, for the United States, amicus curiae.

Robert W. Batchelder, Barry J. Cutler, and O'Connor & Hannan, Washington, D.C., on brief, for American Public Transit Association, amicus curiae.

Robert B. Mann, Providence, R.I., with whom Jean A. Musiker, Providence, R.I., was on brief, for plaintiffs, appellees.

Karen Peltz Strauss, Washington, D.C., on brief, for American Coalition of Citizens with Disabilities, Inc., amicus curiae.

Before CAMPBELL and BREYER, Circuit Judges, and CAFFREY,[*] District Judge.

LEVIN H. CAMPBELL, Chief Judge.

The named plaintiffs in this class action are three handicapped persons and two advocacy groups for the handicapped. They represent a class of "[a]ll mobility handicapped individuals in Rhode Island who are or will be denied access to the buses owned or scheduled to be purchased by the defendant RIPTA [Rhode Island Public Transit Authority]."

Suit was instituted in the district court against RIPTA and other state and federal defendants under 49 U.S.C. § 1601 *et seq.* (the Urban Mass Transportation Act); 29 U.S.C. § 794 (the Rehabilitation Act); the fifth and fourteenth amendments; 42 U.S.C. § 1983; and R.I.Gen.Laws § 40–9.-1–1 (a state statute expressing a policy of assistance to the handicapped). The complaint sought injunctive relief aimed at making the Rhode Island bus system more accessible to mobility impaired persons.

Most significant was the request that 42 new buses which RIPTA was about to purchase be equipped with wheelchair lifts.

While dismissing the complaint as to the other defendants, the district court held that RIPTA and the state department of transportation[1] had violated section 504 of the Rehabilitation Act, 29 U.S.C. § 794. The court granted most but not all of the requested relief.[2] Having found that plaintiffs prevailed under section 504, the court did not consider the other alleged bases of the action. RIPTA appeals from the judgment in plaintiffs' favor.

## I. FACTUAL BACKGROUND

We state the facts only briefly, for they appear at length in the opinion of the district court. 549 F.Supp. 592 (D.R.I.1982).

RIPTA operates a fleet of 267 public buses running on fixed routes throughout Rhode Island. Of these, fifty-three are presently equipped with wheelchair lifts. Ridership on the fixed route system by wheelchair users has been very light: 488 one-way trips in 1980 and 605 in 1981. RIPTA also provides capital contributions and fare subsidies to private paratransit services. These provide door-to-door transportation for the elderly and handicapped in specially equipped vans. Use of paratransit has been extensive. In 1979, the twelve largest paratransit services provided 684,000 one-way trips; in 1981 that figure approached the one million mark. Only a portion of these trips were for mobility impaired handicapped persons such as plaintiffs.

---

[*] Of the District of Massachusetts, sitting by designation.

[1]. RIPTA is the division of the state department of transportation in charge of the bus service and primarily responsible for implementing the district court's order. For the sake of convenience, we refer to appellants simply as RIPTA throughout the opinion.

[2]. The Rehabilitation Act as set forth in 29 U.S.C. § 794 provides in part as follows:

§ 794. Nondiscrimination under Federal grants

No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this Section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978....

This suit was precipitated by RIPTA's decision to purchase 42 new buses for its fixed route service without wheelchair lifts. During the nine days of trial, testimony was given by numerous handicapped riders—and nonriders—of the public transit and paratransit systems, as well as by RIPTA officials, experts on the problems of the handicapped, and representatives from the Houston and Seattle transit systems. Almost all agreed that the transportation currently provided the handicapped in Rhode Island could be improved. The witnesses disagreed, however, on what improvements would be most appropriate and cost effective. There was considerable debate over whether paratransit or accessible fixed-route transportation should be emphasized.

RIPTA sought to show that it had made substantial efforts to provide transportation for the Rhode Island handicapped. It introduced evidence that it had spent for the benefit of the handicapped and elderly 46 percent of all federal transportation monies that it had received. Not only does it subsidize an extensive paratransit service, it operates and advertises some wheelchair accessible bus routes; further, it has constructed wheelchair ramps at various bus shelters. RIPTA also provides free rides and priority seating for the handicapped and special services for the blind. The parties stipulated that RIPTA's expenditures for the mobility impaired exceeded 3.5 percent of its receipts under section 5 of the Urban Mass Transportation Act. RIPTA thus met one illustration of satisfactory "special efforts" contained in federal Department of Transportation regulations. *See infra.* Appellants argued below, and now repeat, that in light of these efforts they cannot be said to have violated section 504 in refusing to do more.

Plaintiffs' evidence, on the other hand, tended to show that the transit system in Rhode Island—both fixed-route and paratransit—is often inconvenient, that some existing special equipment designed to help handicapped persons board vehicles is not serviceable, that RIPTA has ignored them and their needs, and that RIPTA could make significant improvements at relatively little cost.

The district court used a two-step test to decide whether section 504 had been violated. First, the court asked whether the requested relief would consist merely of "modifications" to existing programs rather than inauguration of a new service. 549 F.Supp. at 607. Holding that only the former was involved, it concluded that it could proceed without violating the strictures in *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), against affirmative action. Second, the district court conducted a cost-benefit analysis upon the premise that if the overall cost of fitting out the buses and of other relief was reasonable and not "undue" relative to the benefits conferred, appellants' failure to purchase the additional equipment was an act of discrimination towards the handicapped in violation of section 504. 549 F.Supp. at 607. Concluding that the cost was reasonable, the district court ordered RIPTA to take the following steps:

(1) Purchase the 42 buses complete with wheelchair lifts and also with two wheelchair bays per bus.

(2) Maintain no more than a 15 percent reserve ratio (number of buses held in reserve in case of breakdown as compared with those in use) for lift-equipped buses;

(3) Provide a locking mechanism on each lift-equipped bus to secure electric wheelchairs;

(4) Repair the kneeling feature of its buses (for which repairs the manufacturer has offered to reimburse RIPTA);

(5) Offer some wheelchair accessible weekend and evening service.

The court encouraged RIPTA to cooperate more closely with the handicapped community, but declined to order it to involve the handicapped in the planning process. It also refused to order RIPTA to allow standees on the wheelchair lifts or to retrofit already purchased one-bay buses with a second bay. These determinations in RIPTA's favor were not appealed.

## II. GENERAL CONSIDERATIONS

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, upon which the district court based its decision provides that "[n]o otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program receiving Federal financial assistance." *See* note 2, *supra.* Neither the Supreme Court nor this Circuit has determined whether a private right of action exists under section 504. *See Davis,* 442 U.S. at 404–05 n. 5, 99 S.Ct. at 2366 n. 5; *Smith v. Cumberland School Committee,* 703 F.2d 4 (1st Cir.1983); *Massachusetts Coalition of Citizens with Disabilities v. Civil Defense Agency,* 649 F.2d 71, 75 n. 6 (1st Cir.1981). Appellants have informed us, however, that they do not contest the existence of such a private right, which has been recognized generally in several other circuits. *See, e.g., Miener v. Missouri,* 673 F.2d 969, 973–4 (8th Cir.1982); *Pushkin v. Regents of the University of Colorado,* 658 F.2d 1372, 1377–78 (10th Cir.1981) (collecting cases). Because of this concession we shall assume without deciding, for purposes of the present case, that there is one.

We note at the outset that while members of the plaintiff class are handicapped, in that their mobility is seriously impaired, they do not by any means comprise the whole of Rhode Island's handicapped population.[3] Members of the plaintiff class cannot readily board buses nor seat themselves conventionally, but if lifts and wheelchair bays are installed, almost all of them, the district court found, can travel alone on public buses. 549 F.Supp. at 613.[4] The same is not true of *all* persons handicapped within section 504. There are some to whom the fixed-route system is fully accessible without improvements of any type, and many others to whom, no matter how buses are fitted out, it is inaccessible. For example, many handicapped people suffering from cancer or kidney disease may not be able to use buses at all.

Appellants claim that we need look no further than to the regulations promulgated by the federal Department of Transportation ("DOT") to determine what section 504 requires of them. The regulations, promulgated pursuant to section 504 and also pursuant to section 16(a) of UMTA, 49 U.S.C. § 1612(a) (declaring a national policy that "special efforts" be made to provide mass transportation to the elderly and handicapped), require transit authorities to "certify that special efforts are being made in their service area to provide transportation that handicapped persons, including

**3.** Regulations promulgated by the Department of Health and Human Services ("HHS") define a handicapped person as "any person who (i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 45 C.F.R. § 84.3(j)(1). "Major life activities" are defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* § 84.3(j)(2)(ii).

**4.** The actual number of people in wheelchairs in Rhode Island is uncertain. Plaintiffs introduced evidence that there are 166,200 disabled persons in Rhode Island, of whom 4,300 are in wheelchairs. Defendants contend that the number of handicapped in the state is closer to 50,000 and that the number of handicapped persons confined to wheelchairs is correspondingly less. The district court accepted plaintiffs' figure. It also found that while some wheelchair users were mentally or physically incapable of travelling alone on a fixed route bus system almost all could do so. While acknowledging an absence of "hard data demonstrating the extent to which ridership will increase by making more of RIPTA's buses accesible," the court concluded that more accessible buses would lead to an increase in the use of fixed route buses by wheelchair users. 549 F.Supp. at 613. This, of course, is a difficult matter to judge: for example, while a mobility impaired person may be able to ride a specially equipped bus, he may, as a practical matter, have no means of getting from his house to the bus stop. Proponents of paratransit, which affords door-to-door service, urge that funds should be spent for this rather than for improvement of fixed route systems which, at the moment, do not have very significant ridership in Rhode Island by members of the plaintiff class.

wheelchair users and semiambulatory persons, can use." 49 C.F.R. § 27.77 (1982).[5] Appendix A to the regulation provides three examples "illustrative of a level of effort that will be deemed to satisfy [the special efforts] requirement with respect to wheelchair users and semiambulatory persons." The first of these is the expenditure of 3.5 percent of the monies received under section 5 of the UMTA on programs for the transportation of wheelchair users and semiambulatory persons.[6] The parties have stipulated that RIPTA has spent an average of over 3.5 percent of its annual section 5 funds on qualifying programs.[7] Appellants contend that they are therefore within a regulatory safe harbor, at least with respect to any requirement that they spend additional monies for installation of lifts on the 42 new buses.

The district court disagreed. It found that its "interpretation of § 504 is broader than that contained in the ... regulation," and that it was obliged to follow the statute before the regulation. It stated that while the 3.5 percent expenditure might in some circumstances satisfy a recipient's obligations under section 504, this could not be assumed. It felt that the regulation deserved little deference because it was not a contemporaneous construction of the statute, was the third set of regulations in five years, differed dramatically from the 1979 regulations, and was simply a temporary stopgap promulgated without notice and comment. 592 F.Supp. at 609 n. 5.

## III. ANALYSIS OF SECTION 504

The essence of section 504 is a single sentence forbidding discrimination under federally assisted programs against "otherwise qualified" handicapped individuals "solely by reason" of their handicap. Because it is both ambiguous and lacking in specifics, its scope and effect have been an enigma since section 504 was enacted. Prior to the Supreme Court's decision in *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), one possible construction of the statute was that it guaranteed eligibility to all handicapped persons who could meet the requirements of a particular program *except* for any limitations imposed by their handicap. *Id.* at 406, 99 S.Ct. at 2367. Under this interpretation, "a blind person possessing all the qualifications for driving a bus except sight could be said to be 'otherwise qualified' for the job of driving." *Id.* at 407 n. 7, 99 S.Ct. at 2367 n. 7. In *Davis,* however, a unanimous Supreme Court rejected that interpretation, holding instead that,

> An otherwise qualified person is one who is able to meet *all* of a program's requirements in spite of his handicap.

*Id.* at 406, 99 S.Ct. at 2367 (emphasis supplied). The Court concluded that section 504 required the "evenhanded treatment of qualified ... persons" but did *not* impose an "affirmative-action obligation on all recipients of federal funds." *Id.,* 410–11, 99 S.Ct. at 2369.

---

**5.** The reference to "special efforts" in the DOT regulations is derived from the statutory requirement under the Urban Mass Transportation Act that DOT make special efforts in the planning and design of mass transit facilities to aid the handicapped. 49 U.S.C. § 1612(a). The regulation goes on to state that the affirmative steps which satisfy UMTA are deemed to constitute compliance with section 504 of the Rehabilitation Act. 49 C.F.R. § 27.77(a)(4). Since UMTA imposes more explicit affirmative burdens than does section 504, DOT understandably determined that satisfaction of the requirements under UMTA would suffice to meet the *less* well-defined requirements of section 504.

**6.** The two other examples are purchase of only wheelchair accessible fixed-route equipment until one half of the fleet is accessible, and provision of a system that would ensure wheelchair users of ten weekly round trips at fares comparable to those charged on standard buses.

**7.** Since 1981, appellants have received about $34 million in federal funds. Of this, approximately 46 percent has been spent on services for the elderly and handicapped as follows: $483,918 on wheelchair lifts for buses; $179,875 in capital assistance for paratransit; $4,933,042 in operating assistance for paratransit; and $10,353,218 in fare subsidies for the handicapped and elderly on fixed-route buses.

Following *Davis,* the District of Columbia Circuit struck down an extensive DOT regulation promulgated in 1979 requiring that every mode of transportation in a mass transit system be made accessible to the handicapped. *American Public Transit Association v. Lewis,* 655 F.2d 1272 (D.C.Cir. 1981). The affirmative steps required by this regulation were held to exceed the directive under section 504.[8]

In ordering affirmative relief here, the district court distinguished *Davis* on two grounds. First, the court stated that unlike the plaintiff in *Davis,* plaintiffs here were "qualified" because "there simply are no qualifications for riding a bus."

> *Davis* holds only that section 504 does not compel educational institutions to modify substantially existing programs to permit the participation of the handicapped. It does not define the scope of section 504 in contexts in which the handicapped are admittedly "qualified" to participate.

549 F.Supp. at 606. Second, the district court distinguished *Davis*'s refusal to require an affirmative action admissions program for the handicapped on the ground that the mass transit context presented different considerations. The court quoted from the Second Circuit's recent decision in *Dopico v. Goldschmidt,* 687 F.2d 644, 652 (2d Cir.1982):

> In the context of public transportation and the handicapped, denial of access cannot be lessened simply by eliminating discriminatory selection criteria; because the barriers to equal participation are physical rather than abstract, some sort of action must be taken to remove them, if only in the area of new construction or purchasing.

The district court held that so long as it was merely requiring "modification" of an existing program, and so long as it did not place "undue financial and administrative burdens" on defendant, it was empowered by section 504 to order affirmative relief to the handicapped wherever it found, upon balancing costs and benefits, that the overall costs were reasonable in light of the anticipated benefits. 549 F.Supp. at 607, 610–11. The court then found that while the "costs of adding 42 lift-equipped buses to RIPTA's fleet are not insubstantial ... [being] more than enough to pay for two additional non-accessible buses. ... the [c]ourt cannot say that two additional buses for the able-bodied public are more important than 42 buses that wheelchair users, as well as the general public, can use." *Id.* at 614. The court accordingly determined, contrary to the judgment of Rhode Island's transit authority, that 42 buses should be fitted with wheelchair elevators and bays at a cost of more than $320,000, and that various other actions in addition to those already taken by RIPTA should be taken to assist handicapped riders. It reached this result notwithstanding RIPTA's compliance with current federal DOT regulations approving annual expenditures of 3.5 percent as constituting a satisfactory level of "special efforts" to provide transportation for the handicapped.

We understand the humane reasons which prompted the district court in this case. We conclude, however, that its orders to install wheelchair lifts and bays in the buses exceed the authority of section 504 as construed in *Davis.* The core holding in *Davis* is that section 504 does not impose the duty nor confer the authority on a district court to engage in affirmative action. To be sure, the *Davis* Court acknowledged parenthetically that the line between "a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons" may not always be clear. The Court said,

> It is possible to envision situations where an insistence on continuing past requirements and practices might arbitrarily deprive genuinely qualified handicapped persons of the opportunity to participate in a covered program. Technological ad-

---

8. The District of Columbia Circuit acknowledged in *Lewis* that the Supreme Court in *Davis* had suggested that there might be situations where "at some point a transit system's refusal to take modest, affirmative steps to accommodate handicapped persons might well violate section 504." 655 F.2d at 1278. We discuss this aspect of *Davis* later in the opinion.

vances can be expected to enhance opportunities to rehabilitate the handicapped or otherwise to qualify them for some useful employment. Such advances also may enable attainment of these goals without imposing undue financial and administrative burdens upon a state. Thus, situations may arise where a refusal to modify an existing program might become unreasonable and discriminatory. Identification of those instances where a refusal to accommodate the needs of a disabled person amounts to discrimination against the handicapped continues to be an important responsibility of HEW.

442 U.S. at 412–13, 99 S.Ct. at 2730.

But while *Davis* thus did not rule out the possibility of some affirmative relief in gray areas, its central message remained that section 504 does not impose the duty to engage in affirmative action. The Court said,

> "The language and structure of the Rehabilitation Act of 1973 reflect a recognition by Congress of the distinction between the evenhanded treatment of qualified handicapped persons and affirmative efforts to overcome the disabilities caused by handicaps.
>
> .... [N]either the language, purpose, nor history of § 504 reveals an intent to impose an affirmative action obligation on all recipients of federal funds.

442 U.S. at 410–11, 99 S.Ct. at 2369. We are unable to square the above language with an order imposing a duty on RIPTA to spend over $320,000 on controversial lifts for its new buses. Congress, the *Davis* Court noted, knew how to provide for affirmative action in instances where it wished to do so. *See Davis,* 442 U.S. at 411, 99 S.Ct. at 2369. *See also Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 27, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981).

The district court opined that *Davis* was inapposite because "there simply are no qualifications for riding a bus." 549 F.Supp. at 606. *Compare Ferris v. University of Texas at Austin,* 558 F.Supp. 536, 539 (W.D.Texas 1983). But as the court's

order indicates, wheelchair users cannot board and ride buses unless the buses are specially outfitted with lifts and wheelchair bays; thus, in this limited but important sense the plaintiff class is not "qualified" to use buses of the ordinary sort. And the cost of transforming ordinary buses into lift-equipped ones for which plaintiffs are "qualified" is, as the district court conceded, "not insubstantial." 549 F.Supp. at 614. Semantics cannot hide the fact that the propriety of ordering significant affirmative action is at issue. And, to the extent *Davis* sanctions the imposing of any affirmative action, it does so only in situations where to do otherwise would be plainly arbitrary—"where a refusal to modify an existing program might become unreasonable and discriminatory." 442 U.S. at 413, 99 S.Ct. at 2370. We do not believe that RIPTA's refusal to equip its 42 new buses with lifts and wheelchair bays falls within that narrow category. The record shows that there is an ongoing dispute among experts over whether fixed route buses will attract sufficient numbers of mobility impaired riders to make such improvements preferable to alternative options, such as paratransit. While the district court's choice is doubtless a reasonable one, its virtues are not so self-evident that the failure to adopt it can be called *ipso facto* "unreasonable and discriminatory."

There is yet another reason for doubting the correctness of the district court's approach. In *Davis,* when discussing those situations where a stubborn refusal to take non-burdensome affirmative steps might be tantamount to illegal discrimination, the Supreme Court stated that "[i]dentification of those instances where a refusal to accommodate the needs of a disabled person amounts to discrimination against the handicapped continues to be *an important responsibility of HEW,*" (emphasis supplied), 442 U.S. at 413, 99 S.Ct. at 2370. The quoted language suggests that the relevant federal agency—not the court—has the chief responsibility to identify those instances where a refusal to accommodate the needs of a disabled person amounts to dis-

crimination—and to determine any necessary affirmative steps. DOT is the relevant agency here, as HEW was the relevant agency in *Davis.*[9] For this reason in particular, we believe the district court erred in failing to give weight to the fact that RIPTA, having spent 3.5 percent of its section 5 UMTA funds on programs for the mobility impaired, is deemed by DOT under its regulations to have complied with section 504.

It must be borne in mind that DOT's responsibilities to the handicapped are delineated not only under section 504 but more explicitly and extensively in UMTA. The regulation in question relates to both statutes. Given Congress's delegation of responsibility to DOT and the lack of any legislative standards to guide a court in this area, we believe the district court should have hesitated to order RIPTA to engage in expenditures going beyond the 3.5 percent level endorsed by DOT in its regulation.[10]

Dependence upon the responsible federal executive agency to flesh out any affirmative action obligation imposed by section

504 seems to us far preferable to a post hoc, case by case cost-benefit analysis undertaken by individual district courts around the nation. The district court's approach was to decide for itself, after hearing, what long- and short-range measures for the Rhode Island handicapped would be cost effective and fair, and then to label RIPTA's failure to have adopted these measures as "discriminatory." 549 F.Supp. 607. In doing this, it had to determine which of various hotly disputed transportation policies would best serve the needs of the mobility-impaired handicapped and what level of expenditures would not impose "undue" burdens upon the taxpayers.

If the only question was whether the able district judge had, in this instance, struck a sensible balance in respect to Rhode Island's transportation needs for its handicapped, we might affirm. But to do so, we would have to create the precedent that judges, not state or federal administrators, are charged with devising the nuts and bolts of

**9.** Unlike federal agencies which are subject solely to section 504 of the Rehabilitation Act, DOT is expressly required by section 16(a) of UMTA to make special efforts in the planning and design of transportation facilities so that elderly and handicapped persons can effectively utilize them. *See* 49 U.S.C. § 1612(a). Congress has thus entrusted DOT with the major federal leadership role in this area. There is no evidence that Congress intended to delegate any similar implementing role to the federal judiciary.

**10.** The district court held that the "unusual" history of regulations promulgated under § 504 demonstrates that the current regulation does not deserve deference. 549 F.Supp. at 609 n. 5. We disagree. The kind of distance from the statute and inconsistency of interpretation that justifies giving an agency interpretation of a statute no deference is not present in this case. Agencies may alter their interpretations of statutes from time to time. *Chisholm v. FCC,* 538 F.2d 349 (D.C.Cir.), *cert. denied,* 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976). *See Public Interest Research Group v. FCC,* 522 F.2d 1060, 1066 (1st Cir.1975), *cert. denied,* 424 U.S. 965, 96 S.Ct. 1458, 47 L.Ed.2d 731 (1976). In point of fact, the current 1981 regulation is substantially identical to the original 1976 DOT regulation promulgated after notice and comment under the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.* Section 504 was enacted in

1973; and while the original 1976 regulation was thus not exactly a contemporaneous construction, neither was it at any great distance in time. No agency issued regulations interpreting § 504 prior to 1976. *See Cherry v. Mathews,* 419 F.Supp. 922 (1976).

To be sure, in 1979 DOT adopted the comprehensive regulation struck down in *Lewis,* 655 F.2d 1272. But DOT adopted the 1979 regulation in order to comply with guidelines issued by HEW, not because it necessarily doubted its original assessment of the meaning of § 504 contained in the 1976 regulation. (The court in *Lewis* observed that "[i]f the HEW Secretary had not implemented guidelines enforcing section 504 inconsistent with DOT's 1976 regulations, it is quite possible the later would still be in effect." 655 F.2d at 1279.) Significantly, even the 1979 regulation, like the 1976 and present one, specifies that compliance with § 504 can be effected by spending a fixed percentage of § 5 funds on "special efforts" for the handicapped. The 1976 regulation called for a 5 percent spending level and the 1979 regulation called for a 2 percent spending level. The current figure of 3.5 percent is said to result in approximately the same level of spending on special efforts as was achieved under the old 5 percent figure. 46 Fed.Reg. at 37489.

We can see no reason to treat the present DOT regulation with less than normal deference.

transportation programs for the handicapped.[11] Such a policy would not only be novel, it would be highly questionable. Commentators have pointed out that judges are not selected nor are they trained as administrators, and the judicial process is not structured as an organ of governance. *See generally* D. Horowitz, *The Courts and Social Policy* 59, 257 (1977). If judges eschew the DOT regulation and are themselves to have the last word in this area, they will be doing so totally without legal standard or guidance, since none whatever is provided in the statute. Instead of administering the rule of law, they will be engaged in making personal policy assessments indistinguishable from those made by administrators in executive agencies.

Deciding what type and quantity of special services will provide the handicapped with a meaningful opportunity to benefit from public expenditures on mass transit is an extremely difficult task. The district court recognized that "[i]t simply is not possible to quantify in a precise fashion the number of wheelchair buses that RIPTA is required to purchase or retrofit. Nor is it possible with any mathematical certainty to decide on the number of accessible routes that § 504 requires." 549 F.Supp. at 611. Nevertheless, the court says that this uncertainty "does not justify abandoning the task." *Id.*

The only standard the district court put forward for deciding what additional equipment it would require RIPTA to buy was its cost-benefit formula. Yet as the court candidly said, "[i]t is regrettable that the record does not contain any hard data demonstrating the extent to which ridership will increase by making more of RIPTA's buses accessible." 549 F.Supp. at 613. The absence of hard data, however, acerbates the problem because the statutory terminology and the regulations do not indicate the parameters within which such an analysis should or could be made in the first place.

Were we to affirm the district court's approach, state and federal administrators would be left without any way to know in advance which of their plans would later pass judicial muster and which would be struck down, often at great cost in delay and wasted effort. The cost-benefit test articulated by the district court does not provide the type of predictable standard upon which courts and administrators can rely to prevent judgments from being mere personal predilections. The suggested test requires a balancing of costs and benefits: if the overall costs seem to the court reasonable in light of the anticipated benefits, and the financial and administrative burdens seem not undue, then a failure to make a particular purchase will constitute "discrimination" prohibited by section 504. Assuming that reliable data were available on which such an analysis could be performed, this test lacks any mention of the parameters within which the cost-benefit test is to be conducted. The district court says that "[s]ociety will surely be enriched by [handicapped persons'] participation in the work force and in the cultural life of the community." 549 F.Supp. at 614. While we agree that it is a desirable goal to help the handicapped become active in the social, economic, and political affairs of the community, we are at a loss to place a price tag or value on such participation. The district court concedes that making public transportation accessible is not worth unlimited cost, 549 F.Supp. at 610, but the standard it proposes gives no indication of when enough has been done. Further, the type and nature of data presented to courts on which such a cost-benefit analysis could be performed may be insufficient and surely will vary by locality. The absence of hard data in this case forced the district court to offer an educated guess as to where the balance of cost and benefit should lie. Even if Rhode Island purchased 42 buses with lifts, under this test it would

---

11. At oral argument, counsel for RIPTA made it clear that its principal objection to the court's order was not that the addition of lifts and bays was, standing alone, too costly for the authority to bear, but rather was to the precedent that such an order created. If the court can require this sort of expenditure today, it can order many others tomorrow. And the expenditures are all without control by the local authority.

remain uncertain whether the next purchase of buses should include chairlifts, and if so, how many. After Rhode Island conducted the proposed cost-benefit analysis, anyone whose calculation gave a different result could sue, and a district court judge would determine on an elaborate record after a long and expensive trial what his personal calculation of costs and benefits required.

In contrast, the appendix to the regulation quantifies the obligation of local transit authorities. It advises them in advance what is expected, and unlike the edicts of courts, the regulations can be modified from time to time in the light of experience in some orderly fashion.

We do not believe, moreover, that the DOT regulation should be ignored simply because in a particular case it does not achieve what the court regards as an optimal balance between costs and benefits. Such demands of a regulation drafted for general applicability are unrealistic. The agency may well have determined that a 3.5 percent expenditure would, on balance, be the best spending level in the vast number of cases. The purpose of having such a figure will be defeated if someone can always challenge a state's spending decisions for the handicapped on the basis of a cost-benefit analysis in the particular case.

We conclude, therefore, that the district court erred in ordering affirmative relief based on its own cost-benefit analysis; to the extent Congress authorized modest affirmative relief under section 504 in situations where the line between overt discrimination and affirmative action is hard to draw, *Davis,* 442 U.S. at 412–13, 99 S.Ct. at 2370, we think primary guidance must come from the regulations promulgated by the federal agency responsible for overseeing the federal funds being used by the state or local agency. Some deference is also owed to the policy choices of state and local agencies. Judicial review, to the extent authorized, is limited to the more usual role of disapproving actions found to be illegal, arbitrary or capricious. With these consid-

erations in mind, we examine the relief ordered by the district court.

## IV. REVIEW OF RELIEF ORDERED BY THE DISTRICT COURT

We hold that the district court erred in requiring RIPTA to purchase wheelchair lifts and bays for the 42 buses which it proposes to purchase. Especially where RIPTA has complied with the 3.5 percent level of expenditure set in the DOT regulation, the court's order involved affirmative relief of a type which section 504, under *Davis,* does not contemplate. Accordingly we reverse the lower court's order in this regard.

The district court also ordered RIPTA to take certain other steps which would appear to involve de minimis expense, or perhaps no cost at all, to the Rhode Island agency.

RIPTA had not repaired the kneeling devices on its buses despite General Motor's offer to pay for parts and labor. RIPTA had also failed to provide a locking mechanism for electric wheelchairs even though the cost of doing so appears to be de minimus. Further RIPTA had maintained a higher reserve ratio for its lift equipped buses than for its other buses. The district court ordered RIPTA to repair the kneeling devices, provide locking mechanisms, and maintain a lower reserve ratio. While we now vacate these orders because they were decided under an improper standard, we do not reverse but rather remand them to the district court for further consideration in light of this opinion. It may be that some or all of these matters involve conduct on defendants' part which fits within the language in *Davis* authorizing corrective steps "where an insistence on continuing past requirements and practices might arbitrarily deprive genuinely qualified handicapped persons of the opportunity to participate in a covered program." 442 U.S. at 412, 99 S.Ct. at 2370. RIPTA's refusal to act in those situations may possibly be "unreasonable and discriminatory." *Id.* at 413, 99 S.Ct. at 2370. There are apparently no supervening DOT regulations covering

these matters or providing RIPTA with some proper justification for its actions. (Were any claimed to exist, this would be a proper matter to be argued on remand.)

To be sure, RIPTA's own views are entitled to considerable deference even absent DOT regulations. As the local agency carrying out the program, its reasonable, non-discriminatory judgments are entitled to significant weight. It is not the function of the courts to administer Rhode Island's transportation programs, nor to make their own choices between lawful and proper alternatives available for the treatment of the handicapped.

While we hold that the district court's decision requiring RIPTA to equip buses with wheelchair lifts went beyond its authority, we believe the district court should have a further opportunity to review RIPTA's other actions in light of the standards set forth in this opinion.

*Reversed in part, and vacated and remanded in part.*